FILED

JAN 0 5 2005

MICHAEL W DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

JAN - 6 2005

| | | |
|---|---|---|
| Michael D. Henderson | ) | JUDGE MAROVICH |
| Plantiff | ) | |
| v. | ) | |
| Chicago Board of Education | ) | 05C 0069 |
| Defendant | ) | |
| | ) | MAGISTRATE JUDGE DENLOW |
| | COMPLAINT | |

This is a civil action for reinstatement of employment, back pay, and monetary award for reckless infliction of emotional distress. I asked that this court, with the decision of a jury of this state, grant me these reliefs, because the defendant broke an "implied contract" of "good cause" dismissal and a contractual agreement between the defendant and the Chicago Teachers' Union and its members.

I believe that this court has jurisdiction over this matter, because the defendant broke two contracts, by unjustly terminating me from my teaching position within the Chicago Public Schools without good cause, and by breaking Article 39-4.3 of the Union members' agreement. Therefore, I am filing this complaint under the common law of Illinois for tortious interference with a contractual relationship.

1. I, the plaintiff, will present evidence (exhibits) showing that the defendant-committed fraud, acts of malfeasance, violated their own policies, and the CBE and Chicago Teacher's Union (CTU) agreement in order to terminate my employment.

2. I began working for the defendant in February of 1998 at Leslie Lewis Elementary School, (1431 N. Leamington) under Principal Gladys Pruitt. While teaching there, I received an excellent evaluation (s). And I never received an E-1 notice[1] Furthermore, I taught a summer

---

[1] E-1 notice, is a notice given to a teacher, when said teacher performance rating is reduced at said teacher's present school, it's a form of remediation plan (See exhibit 1, pg.123-24).

1

3. I transferred/was promoted to Nancy B. Jefferson (1100 S. Hamilton) in February of 2000, as a physical education teacher. Mrs. Judith Adams was my principal, and I received two excellent evaluations from her. And I never received an E-1 notice.

4. I transferred to Harvey Academic Prepatory School, in September of 2001, because the physical education position at Nancy B. Jefferson was closed. I resigned from the CBE in December of 2001, and became a day-day sub. Moreover, while teaching at Harvey Academic Prep. School under Principal Clementine Smith, I never received an unsatisfactory rating, nor did I receive an E-1 notice.

5. In August of 2003, I was hired for a .5 physical education position and coaching positions at Durkin Park School (8445 S. Kolin), under Principal Daniel Redmond. Moreover, I was hired by Principal Dr. Corea at Hale School (6140 S. Melvina). Sometime during late September, Dr. Corea was replaced with Principal Teresa Connell.

6. While teaching at Durkin/Hale Schools, I never received an unsatisfactory rating. Nor did I receive an E-1 notice in regards to my job performances.

7. Sometime after January 29, 2004, Teresa Connell made good on her threat to "replace me" for seeking out union counsel/representation, in regards to her underserved and I later discovered bogus evaluation of my teaching performances (see exhibit 2). As I continued to do research on employment law, I became aware of the IELRB (Illinois Educational Labor Relations Board), so I filed an ULP (unfair labor practice) charge on August 25, 2004, (see exhibit 3) against the defendant, for allowing principal Connell to displace me for my union activity. At this time, the case is still pending.

8. The statement in number seven is of great importance, because the bogus evaluation was used by defendant's hearing officer (Kishasha Williams-Ford) to embellish the fact "he has a problem with following directives of superiors, and one supervisor admitted he received an unsatisfactory mark in following school policies." This evaluation was given to me under false pretense and it violated the defendant's Office of Labor and Employee Relations (OLER) protocol for evaluating me as a teacher within the CPS (see exhibit 4). Within this contract[2], it states "Two

---

[2] 2003-2007 Agreement between the Board of Education of the city of Chicago and the Chicago Teachers Union, Local No.1 American Federation of Teachers AFL-CIO, Which at the time, I was a member of

classroom observations needed to form basis of rating. One should be done by principal personally." I was ignorant of this important contractual information. And I was not made aware of it, until Nov 10, 2004, as I was still seeking out evidence for my ULP charge. It helped me to establish motive, as to why principal Connell followed through on her threat to "replace me" for seeking out union counsel. She knew she violated the contract for evaluating me as a teacher. And once the union rep and I would have discovered this. I would have won my grievance against her and she would have been in trouble with the defendant's OLER.

9. In a faxed letter, dated July 17, 2004, I made Cheryl J. Colston (Director of OLER) aware of Mrs. Connell retaliation, but they did not do an investigation into the matter. Nor did they let me know whom I could file a complaint with. And why not?

10. On that evaluation (see exhibit 3), principal Connell wrote in her own handwriting "refused to sign", and wrote her initials "TLC" at the top of it. But when I viewed my employee file on or around July 12, 2004, I realized principal Connell committed a fraudulent act with that evaluation. She re-wrote the evaluation, (see exhibit 5) without my "refusal to sign" it at the top of it, and then she allowed the defendant to put it into my employee file, without my knowledge of it. Why was there a need to do that?

11. On the other hand, the asst. principal (Catherine Miriam Rios) and principal (Daniel Redmond) at Durkin Park School were in compliance with the contract (see exhibits 6-8).

12. So, since the evaluation by Mrs. Connell was given to me under fraudulent pretense, the contents of it should have not been embellished upon by hearing officer Ford to help terminate my employment from the CBE.

13. After the defendant allowed principal Connell to unjustly and secretly displace me, I became a day-day cadre substitute teacher on February 23, 2004. I was told by a Mrs. Gloria Trujillo, a person working in the defendant's human resource department (125 S. Clark). "Since she (principal Connell) did not go about the right way of doing it, we had to pay you in another position number." And I noticed that changed position number on a February 27, 2004, check stub. Moreover, I lost sick days, low-cost health care, my basketball team, good-natured pupils and a chance to be put on tenure track as a teacher.

THE WESTINGHOUSE HIGHSCHOOL (WHS) INCIDENT

3

14. On May 17, 2004, I had a teaching assignment at WHS (3301 W. Franklin Blvd) for a Mr. Anderson (accountant teacher) in room 111. Before I took the class over, one of the office clerks directed me to go upstairs and cover for a Mr. Richardson, because he was running late.

15. After covering for him, I returned back to the office. As the clerk was getting the assignments ready for the pupils. I asked her the following: a) Do I let pupils in without a tardy pass? Yes, b) Do I allow pupils to use the rest room? Yes, but give them a hall pass c) Do I check i.d.s? Yes.

16. After asking her these questions, she told me to go to room 111, and she would bring the materials to me. When I arrived to the room, there was a female sub sitting down and drawing pictures of a female student. Furthermore, I noticed one pupil come in late and she did not check his i.d. and another pupil got up and left at his own discretion. When the clerk arrived, she directed this sub to another location, and gave me the materials for the pupils to work on.

17. The second and third period class was as one class (i.e. 80-100 minutes). During these class periods, I became aware that the intercom was broken. When I asked several female pupils to give me gambling cards, they said no and continued to play cards. So, I pushed the intercom repeatedly, and realized it was broken and even the girls said "Ah, that don't even work." So, I stepped outside the door and called for the security. When the security guard arrived, I told her the situation. And she asked the pupils for the cards. They responded by saying "Get out of here, bettlejuice" and moved their hands away from her. She then turned to me and said "for get about it." After I received my hearing file, I discovered that her name was Ms. Grant.

18. Furthermore, I asked her to assists me with a pupil, who came late and did not have his i.d. to get into class. She suggested that I write him up and I did, and sent it to room 050.

19. During my prep period, I listened to my c.d. player, read my book, did a crossword puzzle and made a couple of phone calls.

20. When the prep period ended, I put these items away. And was ready for the next class, which would be a 6th, 7th and 8th as one period class for about 120-150 minutes.

21. During these class periods, I was not given official WHS attendance sheets, and why not?

22. As the pupils were coming into the class. I told them I would not allow them to sign in until 2:30 p.m., because I did not want them walking out on me. I was hoping this would keep them in class for the day's credit.

4

23. Five pupils came in and left the class immediately without sitting down. And three came in and sat down. And I explained the day's assignment to them. One of the girls got up and stood by the door, and Ms. Grant asked her "What are you doing out here?" The female pupil responded by saying "It's boring in there." I was under the impression that Ms. Grant was going to turn the pupil back into the classroom, because she did not have a hall pass or note from me, as instructed for me to do by the office clerk earlier that morning. The girl did a little dance and walked away and Ms. Grant did nothing. Eventually, the two pupils sitting down got up and left.

24. With no pupils in the classroom, I began to listen to my c.d. player. Then within ten minutes, a lady. Who I thought was an office clerk, told me "Our principal does not allow head phone use in the classroom, and you have to go to the lounge if you want to listen to your head phones. So, I removed the headphones and started reading a book.

25. While I was reading my book, I noticed two women talking to each other across the hall way, I found out later that they were Dr. A Jackson and principal Lona Bibbs. After they talked for about fifteen mins, one of the women left that room and came over to my class. She then told me in a mean and angry voice "you're not earning your paycheck, with your foot propped up and reading that book." I then said, mam, how can I do work, when there are no students in the classroom? She then said "you should have went to the attendance office and called the student's parents."

26. I had no idea where the attendance office was at, and the clerks gave me no further instructions of what to do, when the pupils left the classroom in such a like fashion. With a broken intercom, I could not report them leaving. The WHS security guards failed to return the pupils to the classroom, because I did not give them a pass or note to leave the classroom. And I did not want to leave the class unsupervised. Because the class was a triple period class, and I did not want pupils showing up to an empty room.

27. I then told her (Bibbs) I did not know where the attendance office was. I then asked her, do you approach all of your subs like this. She said "Yes!" I knew she was lying, because if she did, the female sub (during 1st period) would have not felt comfortable sitting down and drawing pictures of the female pupil.

28. I then said, you're making me feel like a lazy blackman. She responded by saying, "I have a witness (pointing to Dr. A. Jackson) that you're sitting down and not working." I responded by saying, you could have sent me to the attendance office to do some work. And I told her, I

would have a job by next week. She said "Where!" At the fear being black balled by her, I said that's really none of your business, mam. She then said "Oh! I can find out!" and I responded by saying, you can't stop me from getting the job. She then said "I am the principal!" [along with her tone of voice and body gestures, that was an outright threat]. I then said, I don't care, who you are, your not God. Then she said "I can't believe this, come with me." As I stood up to gather my belongings, I told her I would be writing up a complaint about how she approached and treated me to the Union. I then asked her would I be getting paid for the day. She shook her head and said "NO!" So, I sat back down, because I had been earning my pay the whole day, and I needed that money. Once again, she said "I can't believe this" and left the classroom.

29. She returned several minutes later with the school's police officer. There was no need to do that, I only needed to be told that Barbara Brooks (a woman, who called me for my daily assignments) or Angela Simpson (a sub center supervisor) said its best you leave, and I would have left. I was never violent, nor did I curse at Lona Bibbs. In matter of fact, the behaviors Lona Bibbs and some of her staff (keep in mind her staff-bias articulation at its worst-) falsely accused me of. I have never displayed on any job. I just didn't wake up and say "today, I am going to go crazy on the job." On the contrary, I was in a good mood, because next week I was going to have a job.

30. Upon stepping into the room with the police officer, she said "I just talked to God!" she was referring to Nancy Slavin as "god", as a means of mocking me. I then reiterated the fact that I would be filing a complaint with the Union. She said, "I just wrote you up to Nancy Slavin." Then the police officer said "It's best, you get your things and go."

31. Before I swiped out, I asked for the position number, so I would receive payment for the day. No one said anything. So, the cop said "can he get the number?" Then without hesitation, Lona Bibbs said "You're not in the position to be asking for anything!" Then the cop said "Just leave, you see they are not going to give you the number." So, I swiped out and left. I felt humiliated and taken advantage of. And Bibbs behavior was unbecoming of a principal (exhibits 26 and 14 # 8).

32. As soon as I hit pavement, I called Sub Center (125 S. Clark), and asked to speak to Angela Simpson... So, I was transferred to her immediately. I told her about the day's events. She agreed that if I had physically blocked the pupils from leaving, it could have lead to a physical altercation. She said "Even though, they did not give you the position number, they will give it

6

to us, so you will be getting paid." I told her, I would be writing up Mrs. Bibbs up, she said "Go ahead, because she will probably be writing you up as well."

33. After hanging up with A. Simpson, I phoned the Union (222 Merchandise Mart Plaza, Suite 400). The clerk switched me over to a David Friedman, because he was the union representative for the teachers at WHS. After I briefly told him the incident, he said "As long as you are getting paid, drop it, because Lona Bibbs is a mean son of a bitch." I said okay and left it at that.

THE DEFENDANT AND UNION

34. On May18, 2004, Barbara Brooks told me that I was barred from work. I said for what? She A. Simpson said "You had too many complaints", I said what are the complaints? she said "I don't know, you have to call back at 9:00 a.m. and talk to A. Simpson." I said okay and immediately headed to the union.

35. Before David Friedman arrived, I talked to Barbara Brooks, who then informed me that A. Simpson said "you will be having a hearing." I said okay. When Friedman arrived, I informed him of the information given to me by Brooks. He then replied, I will call over there and try to resolve this, before a hearing. He got no answer. So, he told me, I should go over there and talk to Simpson and Slavin.

36. After waiting for about 15 mins., I was approached by Slavin and Simpson. Slavin, said I would be having a hearing, because I had "too many complaints." I asked her what are the complaints?, she shrugged her shoulders and said "I don't know." So, I asked Simpson, she responded by saying "All that will be brought out at the hearing."

37. These responses given to me by these two supervisors did not resonate well with me, because of the following reasons: a) I was never reprimanded in my whole seven year career (by the dept. human resources) while working for the defendant, nor was I given any memos or ill documentation in regards to me working and teaching within the CPS., b) these supervisors had more than 24 hours to get the documentation showing these alleged "too many complaints," and they never reprimanded or gave me any memos showing I was complained about at any school, nor did I sign off on anything acknowledging that I had. The only reprimand given to me, was by Barbara Brooks. She said "you have to stop calling in for your assignments or Simpson is going to make you a day-day sub, you have to follow the rules." That was the only reprimand given to me by anybody in the defendant's dept. of human resources. I heavily theorize that Slavin and Simpson told me these lies (with no proof), because they were in collusion with principal Bibbs

to terminate me from my job. Because they knew that if I made it to a hearing, there would be a strong possibility that I would get fired and lose my job. What other reason (s) would they lie to me about "other complaints"? Even one of the hearing officers in the defendant's OLER, alluded to that fact in their continued termination of me (see exhibit 18).

THE HEARING

38. I was given the summon paper for the hearing on May 24, 2004, (see exhibit 9) and the "allegations" made against me. As you read through the letter, Lona Bibbs accused me of "being belligerent, confrontational, having a threatening posture and the need to have a police escort." Notice, I was not accused by Principal Lona Bibbs "of being derelict in my duties, by listening to music with head phones, and not reporting the absences of the pupils."(exhibits 22 and 23 ) She did not accuse me of this, and why not? Because she knew she was negligent for putting me in a classroom with a broken intercom, which was dangerous not only for the pupils, but me as well. Furthermore, the defendant's policy states (exhibit $10^3$), it is the defendant's principal's job to make sure broken equipment is fixed and functioning in her school and not mine. Furthermore, Bibbs did not charge me with those allegations, because she knows, as well as the defendant knows. Their Safety and Security policy states (exhibit $11^4$) "Do not leave a classroom unsupervised"...reports made to the office via the intercom system, radio, etc." So, I did not leave the classroom, because if the pupils showed up to an empty classroom, I would be breaking the defendant's safety and security policy. Nor did they give me a radio to make reports. This was very dangerous. Moreover, I was a guess worker in their school, and I was relying on the security to assists me with any disciplinary problems and keeping the pupils in the class. When I am subbing in good schools, if a pupils walks out of the classroom without a pass or note from the sub or teacher. Security immediately escorts the pupil back to the class to investigate, why the pupil does not have a pass or note. Because disciplined and good security knows that some pupils (especially high school pupils) manipulate, coerce and get over on the subs. The defendant knows that these are duties required of the security guards. And they know that Ms. Grant should have never told me to "forget about it", when I asked her to assists me with getting those gambling cards. And in redundancy, they know the security guard should have assisted me with keeping the pupils in the classroom. Furthermore, Bibbs did not charge me with not

---

[3] Was taken directly from the defendant's policy website
[4] Was taken from the defendant's safety and security policy website

reporting the students' absences, because they never gave me official attendance sheets with the pupils' names on there. How am I supposed to report pupils leaving, when the defendant's. principal doesn't give me the means to make that report? I made the defendant aware of all this via letters and hearings. But they have kept me fired for a bad cause. So, I asked that this court appoint a jury to hold them accountable for breaking my implied contract of "good cause" dismissal. In her flawed termination summary, even Ford admitted "though not charged." How can I be terminated for something the principal did not charge me with? Moreover, how can I be terminated for being put into a catch twenty-two situation? And why wasn't Ms. Grant held accountable for being derelict in her duties, as security guard?

39. On May 27, 2004, I had a hearing at the defendant's OLER (125 S. Clark, 13th fl). Kishasha Williams-Ford was the hearing officer, and Mr. Friedman was the union representative. I have submitted the hearing tape as exhibit 12. As you listened to that tape, there were no other "complaints brought out." According to the Employee Due Process policy, (exhibit 13, pg.4). The hearing officer was supposed to have "copies of letters, memos, etc., received by the employee *(me)* indicating that earlier attempts were made to counsel the employee, and that suggestion for improvement to assist the employee in remediating the conduct were offered (when applicable). Include verbal warnings, if given." When no such evidence was presented at said hearing, I came to understand that Simpson and Slavin gave me fraudulent information. Moreover, I faxed various letters to the defendant's OLER stating that they violated their own substitution policy (exhibit 14). Within the policy, number four states the following "Performance issues/incident reports about your conduct at the school sites may result in an investigation and/or hearing to determine your employment status. Substitute employees are subject to the Chicago Public Schools Employee Discipline Code." In other words, in their 2003-04-substitution policy, they were offering progressive discipline to substitute teachers. [5]See Weiss V. N.Y. Life Ins.Co., No.94-C7023, 1995 U.S. Dist. Lexis 3179, at * 6-7 (N.D. Ill. Mar. 13, 1995) (Aspen, J.) and Dudulao V. St. Mary of Nazareth Hospital, 505 N.E. 2d 314, 318 (Ill.1987). Furthermore, if I had committed any wrongdoing, the defendant was supposed to implement this progressive discipline. Because there were no other "complaints" made against me. The defendant has knowingly and maliciously broken an implied contract. They have ignored mitigating factors, lied, and broken their own policies to unjustly

---

[5] **Relevant Case Laws.**

505 N.E. 2d 314, 318 (Ill.1987). Furthermore, if I had committed any wrongdoing, the defendant was supposed to implement this progressive discipline. Because there were no other "complaints" made against me. The defendant has knowingly and maliciously broken an implied contract. They have ignored mitigating factors, lied, and broken their own policies to unjustly terminate my employment. So, I asked that this gracious court allow me a trial by jury, so I can obtain my sought reliefs.

40. On June 8/9, of 2004, I went to the union with a tape recorder, because the union rep (David Friedmand) said and did some questionable things before and at the hearing. So, I wanted to get some proof of unfaithfulness. To give you an idea of what I am talking about compare exhibit 15 with exhibits 16 & 17 (he gave me fraudulent information). Moreover, in exhibit 18, the defendant's hearing officer confirms (i.e. told on) that the union rep said some questionable things that help lead to my termination. During the hearing, but when we were off the record. I asked the hearing officer, what would be some possible disciplines "She stated the following: "(1) They might throw it out (2) They might demote you or (3) The worse case scenario-termination." Without hesitation, the union rep blurted out in front of the hearing officer "You! better be lucky, they don't get rid of you." And upon leaving the hearing, he walked away with the hearing officer and said "I earned my seventy-five dollars." I felt humiliated and shocked at the same time. And it made me feel as though he was in collusion with the defendants. If I had known about the IELRB at that time, I would have filed an ULP charge in a heartbeat. So, I had a tape recorder and the tape is (exhibit 19[6]).[ I will file a motion to have that tape submitted as evidence] During that conversation, Friedman admitted the following: (1) "Lona Bibbs is a mean son of a bitch/son of a gun", (2) "She was rated one of the lowest in the city by her whole staff." (3) "Ford (hearing officer) was so upset with you! she said … (4)"Dave, I lost it! (5) "I tell you my friend, she was angry at you"… (6) Oh! during the hearing, they can hold their (hearing officers) anger in."

41. I received my termination letter on June 17, 2004, and my hearing file on July 17, 2004. And after I read the hearing officer's termination summary (exhibit 20), I realized that everything that Mr. Friedman told me in that taped conversation was true. And Mrs. Ford terminated me because of retaliation and not because of an honest investigation into the facts. What other

---

[6] **This exhibit was given to the defendants law dept, as well as the union, see exhibits 24 and 25**

defendant knows that these are duties required of the security guards. And they know that Ms. Grant should have never told me to "forget about it", when I asked her to assists me with getting those gambling cards. And in redundancy, they know the security guard should have assisted me with keeping the pupils in the classroom. Furthermore, Bibbs did not charge me with not reporting the students' absences, because they never gave me official attendance sheets with the pupils' names on there. How am I supposed to report pupils leaving, when the defendant's. principal doesn't give me the means to make that report? I made the defendant aware of all this via letters and hearings. But they have kept me fired for a bad cause. So, I asked that this court appoint a jury to hold them accountable for breaking my implied contract of "good cause" dismissal. In her flawed termination summary, even Ford admitted "though not charged." How can I be terminated for something the principal did not charge me with? Moreover, how can I be terminated for being put into a catch twenty-two situation? And why wasn't Ms. Grant held accountable for being derelict in her duties, as security guard?

39. On May 27, 2004, I had a hearing at the defendant's OLER (125 S. Clark, 13th fl). Kishasha Williams-Ford was the hearing officer, and Mr. Friedman was the union representative. I will file a motion to submit the hearing tape as exhibit 12. As you will listen to that tape, there were no other "complaints brought out." According to the Employee Due Process policy, (exhibit 13, pg.4). The hearing officer was supposed to have "copies of letters, memos, etc., received by the employee *(me)* indicating that earlier attempts were made to counsel the employee, and that suggestion for improvement to assist the employee in remediating the conduct were offered (when applicable). Include verbal warnings, if given." When no such evidence was presented at said hearing, I came to understand that Simpson and Slavin gave me fraudulent information. Moreover, I faxed various letters to the defendant's OLER stating that they violated their own substitution policy (exhibit 14). Within the policy, number four states the following "Performance issues/incident reports about your conduct at the school sites may result in an investigation and/or hearing to determine your employment status. Substitute employees are subject to the Chicago Public Schools Employee Discipline Code." In other words, in their 2003-04-substitution policy, they were offering progressive discipline to substitute teachers. [5]See Weiss V. N.Y. Life Ins.Co., No.94-C7023, 1995 U.S. Dist. Lexis 3179, at * 6-7 (N.D. Ill. Mar. 13, 1995) (Aspen, J.) and Dudulao V. St. Mary of Nazareth Hospital,

---

[5] Relevant Case Laws.

terminate my employment. So, I asked that this gracious court allow me a trial by jury, so I can obtain my sought reliefs.

40. On June 8/9, of 2004, I went to the union with a tape recorder, because the union rep (David Friedmand) said and did some questionable things before and at the hearing. So, I wanted to get some proof of unfaithfulness. To give you an idea of what I am talking about compare exhibit 15 with exhibits 16 & 17 (he gave me fraudulent information). Moreover, in exhibit 18, the defendant's hearing officer confirms (i.e. told on) that the union rep said some questionable things that help lead to my termination. During the hearing, but when we were off the record. I asked the hearing officer, what would be some possible disciplines "She stated the following: "(1) They might throw it out (2) They might demote you or (3) The worse case scenario-termination." Without hesitation, the union rep blurted out in front of the hearing officer "You! better be lucky, they don't get rid of you." And upon leaving the hearing, he walked away with the hearing officer and said "I earned my seventy-five dollars." I felt humiliated and shocked at the same time. And it made me feel as though he was in collusion with the defendants. If I had known about the IELRB at that time, I would have filed an ULP charge in a heartbeat. So, I had a tape recorder and the tape is (exhibit 19[6]). During that conversation, Friedman admitted the following: (1) "Lona Bibbs is a mean son of a bitch/son of a gun", (2) "She was rated one of the lowest in the city by her whole staff." (3) "Ford (hearing officer) was so upset with you! she said … (4)"Dave, I lost it! (5) "I tell you my friend, she was angry at you"… (6) Oh! during the hearing, they can hold their (hearing officers) anger in."

41. I received my termination letter on June 17, 2004, and my hearing file on July 17, 2004. And after I read the hearing officer's termination summary (exhibit 20), I realized that everything that Mr. Friedman told me in that taped conversation was true. And Mrs. Ford terminated me because of retaliation and not because of an honest investigation into the facts. What other reason(s) would should give embellishing, misleading and lie statements in her termination summary?

42. As I analyzed exhibit 20, with exhibits 12 and exhibit 21. Ford made misleading, embellishing and lie statements: "he substitute taught 13 times at WHS", I only subbed there twice for the 03-04 school year. "He has a history of being argumentative", She used one evaluation, in which I received an excellent on it, to state I had a "history" of being

---

[6] This exhibit was given to the defendants law dept, as well as the union, see exhibits 24 and 25

argumentative. Common sense should have told her, if I started the arguments, I would have never received an excellent on it. She took the bogus and fraudulent evaluation, I received from Connell and stated "he has a problem of following directives of superiors (plural), where is the proof of that? To the answer of me asking Mrs.Bibbs, would I get paid? Ford transcribes her to "saying., "I'm not sure." She flat out said "No!" Moreover, as asked to me by hearing officer Ford (on the hearing tape) "Given your new found information, would you respond differently next time?" I responded by saying yes. Even though a principal is being mean, nasty and disrespectful towards me, I will leave the building, when he or she asks me to. But in her termination summary, she stated the following "It is likely that Mr. Henderson, will respond similarly, when faced with such philosophical and pedagogical differences." What is the use of asking me a question like that at the hearing, when you're not going to take my answer into consideration? Furthermore, Ford failed to consider or take into account the following: and why? While teaching at Nancy B. Jefferson, Principal Adams stated I had "Strong knowledge base displayed. Enthusiasm for position. Creative with instructional activities, attendance & punctuality excellent. Completes administrative task accurately + on time." She failed to mention or take into account the Principal at Durkin gave me a satisfactory in "following school policies. Furthermore, he gave me an "excellent" as a potential as a teacher. I gave Ford an evaluation from Valley View Public Schools District 365U, in which the principal marked me with an excellent in "performs duties in accordance with Board of Education, administration and School Policies. I am an excellent teacher, and should have not been terminated from my job, and the defendant's knows this.

43. I understand that in the school of law and in our judicial system. When a witness is caught lying in his/her testimony. And the judge is alerted to it. That witness's whole/entire testimony is vacated, because it brings into question everything that witness has said. Moreover, when a judge/hearing officer is found to have committed malfeasance acts, the plaintiff or defendant is given a new trial or hearing, and that judge is removed. So, I ask that this honorable court allow me a trial by jury, so I might obtain my sought reliefs.

44. The union filed a grievance on my behalf on September 13, 2004, because the defendant broke Article 39-4.3[7] of the contractual agreement[8]. But on Dec 3, the union failed to prepare

---

[7] The agreement between the defendant and CTU and its members, stating that two unsatisfactory evaluations are needed, before termination. See Exhibit 1, pg. 125

11

my case for arbitration, so on Dec 15, 2004, I filed a charge with the IELRB. Because by denying my grievance for arbitration, the union committed random acts of fraud, hostility, and did not do an adequate investigation.

45. In the process of denying my grievance, the defendant's hearing officer and chief executive officer admitted/confirmed in exhibits 22 and 23 that "in accordance with Article 39-4.4[9], dismissal for cause, which states in part that any decision to discipline is within the exclusive discretion of the principal and/or Board and is not subject to the grievance procedure." Although, they deliberately or in guilt leave off the "good", they confirmed I can only be dismissed for "good cause." Nowhere does the defendant's hearing officer and chief executive officer state "Mr. Henderson is an at -will worker, and we can get rid of him at any time for any reason (see footnote number 5). They are intelligent enough to make a distinction between the two or may be they think I am too stupid to figure out the difference between the two.. In the process of filing my ULP charge with the IELRB against the union. I came across the Chicago Teachers' Union, Local 1 v. Chicago Board of Education, Docket#2001-CA-0047-C 18 PERI 1096 (May 2002). Even though the defendant used that same rationale to deny this teacher grievance, the union still filed for arbitration on this teacher behalf, and the arbitrator ruled in favor of the grievant. Because "he found that the school board had failed to follow the District's disciplinary procedures that those procedures were a pre-condition to the imposition of discipline. He therefore found that the suspension and the warning resolution were both rescinded and the grievant be made whole in all aspects." In comparison to my case, before the defendants can impose that defense on me. They have to do an honest investigation, follow their own policies and procedures, and honor the agreement between them and union members.

46. So, I ask that this court mercifully and prayerfully grant me a trial by jury, so that I may return to teaching pupils within the Chicago Public Schools and obtain my other sought reliefs. Because the defendant has terminated my employment for a bad cause, thereby breaking an implied and union contractual member agreement.

47. In regards to emotional distress. When I received my termination letter on June 17, 2004, it felt is though someone had shot me. Because, I could not believe I could be terminated for doing my job to the best of my ability. Every day I think about the malfeasance acts of hearing officer

---

[8] See Duldulao, 505, N.E. 2d at 317 and Mitchell, 568 N.E. 2d at 828
[9] Taken from the agreement between the defendants and the union and its members.

Ford, the lies that were told by Nancy Slavin and Angela Simpson that led me to a hearing. Furthermore, the defendant has caused me great distress, because they know I abided by their policies and they still terminated me for being a catch twenty-two situation, without considering mitigating factors. So, I asked that this merciful and gracious court, grant me a jury trial so that the defendant will be held accountable for their malicious actions.

Plaintiff's signature

_Michael D. Henderson_

Plaintiff's name

_Michael D. Henderson_

Plaintiff's street address

_2728 W. Wilcox, Chicago, Il. 60612_
_(773) 396-7955_

13

## EXHIBITS

Exhibit 1: Explanation of an E1 notice

Exhibit 2: Bogus Evaluation submitted by Principal Teresa Connell

Exhibit 3: Copy of my current ULP charge against Principal Connell and the defendant

Exhibit 4: Pg 11 of the contractual agreement between the defendant and the union and its members

Exhibit 5: Fraudulent evaluation submitted by Principal Connell into my employee file

Exhibit 6: Evaluation by Asst. Principal at Durkin Park

Exhibit 7: Evaluation by Principal at Durkin Park

Exhibit 8: Evaluation, signed by me, and then submitted into my employee file

Exhibit 9: Summons paper to a hearing at defendant's OLER

Exhibit 10: Policy statement, stating it's the defendant's principal job to make sure broken equipment is fixed

Exhibit 11: Copy of Safety and Security policy

Exhibit 12: hearing tape

Exhibit 13: Copy of information, in regards to employee due process

Exhibit 14: 2003-04 Substitution Policy

Exhibit 15: Fraudulent letter from union rep (David B. Friedman)

Exhibit 16: Union files grievance

Exhibit 17: Union files grievance

Exhibit 18: Defendant's hearing officer (Thomas Krieger) alludes to the fact, that the union rep said some questionable things at hearing

Exhibit 19: Tape recording of union representative statements about Lona Bibbs and Hearing Officer Ford

Exhibit 20: Hearing Officer termination summary

Exhibit 21: WHS Incident given to hearing officer FORD

Exhibit 22: Defendant confirms, I have an implied contract

Exhibit 23: Defendant confirms, I have an implied contract

Exhibit 24: Letter signed by union in receipt of the tape

Exhibit 25: Letter signed by defendant's law dept. in receipt of the tape

Exhibit 26: Copy of etiquette behaviors of the defendant's principals

14

# EXHIBIT

# #

\

The Bureau of Teacher Personnel shall provide the released FTB teacher with a list of all vacant positions for which said teacher is qualified. This vacancy list shall be updated and published on a monthly basis. Released FTB teachers serving in the Cadre shall be given the opportunity to apply and be interviewed for vacant positions throughout the school year. The Bureau of Teacher Personnel shall maintain a list of released FTB teachers in order to assist principals in filling vacancies. An FTB teacher released from a school will not be reassigned to a vacancy temporarily filled by another FTB teacher.

c.   A member of the Cadre may be selected at any time by a principal to fill an existing vacancy provided that this reassignment is consistent with the area of certification required for said vacancy and is consistent with the compliance goals for faculty desegregation outline in the Consent Decree approved by the United States District Court. If reinstated as an FTB teacher, said teacher shall be placed on the appropriate lane and step of the salary schedule and shall receive all benefits herein provided to FTB teachers.

d.   The BOARD and the UNION agree that said displaced FTB teachers shall be included in the number of Cadre substitute teachers maintained by the BOARD under the provisions of Article 27-1-1 of this Agreement. If the number of released FTB teachers causes the size of the Cadre to exceed the specified 300 members from September to November 1 or 900 from November 1 through the end of the school year, the BOARD shall increase the size of the Cadre to accommodate inclusion of any released FTB teachers.

**38-6.**   A review committee shall be established to hear and decide appeals only on the basis of hardship in the case of a regularly certified teacher whose appointment was made subsequent to June 30, 1999, to enhance and maintain the goals of the Plan provided said teacher has not had a prior review within the past twelve months.

**38-7.**   The Principal shall notify teachers in encumbered and interim positions, in writing, prior to advertising said positions in the superintendent's bulletin. This procedure shall also ap-

ply to new and vacant posit cant posit school for  *EXHIBIT #1*  New and vacant posit place in the deadline.

## ARTICLE 39 — TEACHER EFFICIENCY RATINGS

**39-1.**   Teacher efficiency ratings shall be distributed to the individual teachers at the local school on or before Friday of the 38th week of the school year except in schools which operate on 44 week, 46 week, 48 week, or 52 week term. Said schools shall issue and distribute efficiency ratings on the Friday immediately prior to the final week of the school term.

A copy of said rating shall be placed in the individual teacher's personnel file.

**39-1.1.**   All appropriate administrators shall hold an orientation meeting after the 20th school day but prior to the 40th school day to review and explain the teacher efficiency rating procedures as set down in Articles 39-4.1, 39-4.2 and 39-7 of this Agreement.

**39-2.**   Regularly tenured teachers shall be graded only once yearly except for those who are unsatisfactory. Effective with the 2000-2001 school year, tenured teachers rated excellent or superior shall be rated every two years. Tenured teachers rated satisfactory shall be rated once yearly.

**39-3.**   A principal newly assigned or transferred to a school shall give an efficiency grade to substitute teachers and to those teachers who are on their probationary period. Said principal shall not grade tenured teachers whose work is satisfactory or better until said principal has served in that school at least five months.

**39-4.   Efficiency Rating Procedures - Unsatisfactory Probationary (Non-Tenured) or Substitute Teachers.**

**39-4.1.   Unsatisfactory Probationary Teachers.** Whenever, in the opinion of the principal, the service of a probationary teacher is considered unsatisfactory, the following procedures take place:

a)   The principal of the school notifies the teacher in writing, using Form E-1. This notice, which is given to the

teacher in a place insuring privacy, states the reasons for the unsatisfactory rating and offers suggestions and assistance to the teacher for improving said teacher's services.

b) The principal sends two copies of the E-1 notice to the district superintendent, one for the regional officer's file and one to the Department of Personnel.

c) Following the issuance of the E-1 notice, the principal visits the teacher at least three times and has at least three conferences with said teacher at a place insuring privacy. The regional officer also visits the teacher. Following each conference, written suggestions are made to the teacher for improving said teacher's services.

The principal shall give the teacher a written memo which will verify, in each instance, that the teacher was visited and that a conference as above described was held.

d) Upon completion of the 40 school day period after the issuance of the E-1 notice, if the services of the teacher continue to be unsatisfactory, the principal shall present an E-2 notice to the teacher in a conference at a place insuring privacy, and copies are distributed as indicated above.

If the teacher has not received an E-2 notice by the end of the 45th school day following the issuance of the E-1 notice, said E-1 notice is voided and shall be removed from all files and records.

e) The Department of Personnel then calls a conference in which the following persons are included: the teacher, the principal, the district superintendent, the assistant superintendent in charge of personnel or designee. At this conference the unsatisfactory rating is discussed. A recommendation is then made to the General Superintendent of Schools regarding the action to be taken.

**39-4.2. Unsatisfactory Full-time-basis (FTB) Substitute Teachers.** In the case of an unsatisfactory full-time-basis (FTB) substitute, the following procedure shall be followed in making such a rating:

a) Whenever the principal of a school is of the opinion that the services of an FTB teacher are unsatisfactory, the

124

principal shall notify the teacher in writing stating the reasons for the unsatisfactory rating and offering suggestions for improvement.

b) After the issuance of a notice of unsatisfactory service, the principal shall visit the teacher, observe the teacher in a teaching situation, and confer with said teacher in a place insuring privacy, to offer assistance in improving said teacher's service.

If the principal feels that the work of the teacher is still unsatisfactory, after at least 15 school days following the issuance of the notice of unsatisfactory service, the principal shall notify the Department of Personnel. The principal shall give the teacher a written memo, in duplicate, which will verify that the teacher was visited and that a conference was held. The teacher shall initial the memo and return one of the copies to the principal.

c) The Department of Personnel shall schedule a conference with the FTB teacher to inform the teacher of the receipt of the unsatisfactory rating and give said teacher positive suggestions for improvement. If this is the first unsatisfactory rating, the Department of Personnel may consider transfer to another teaching situation.

**39-4.3. Unsatisfactory Day-to-Day Substitute Teachers.** Whenever a temporarily certificated teacher employed on a day-to-day basis receives an unsatisfactory rating, the Department of Personnel shall schedule a conference with said teacher to give the teacher a written copy of the reasons for the unsatisfactory rating, discuss the reasons, and to give positive suggestions for improvement to the teacher.

The services with the school system of an unsatisfactory temporarily certificated teacher employed on a day-to-day basis shall not be terminated until said teacher has been given an unsatisfactory rating by at least two principals, unless there is evidence of moral laxity or serious misconduct.

**39-4.4. Dismissal for Cause.** Sections 39-4.1, 39-4.2, and 39-4.3 are efficiency rating procedures only and shall not limit the right of the BOARD to remove any teacher for good cause. The efficiency rating and any decision to discipline are within the exclusive discretion of the principal and/or BOARD and are not subject to the grievance procedure.

125

# EXHIBIT
# #
# 2

EXHIBIT
#2

Rec'd 1-29-04

CHICAGO PUBLIC SCHOO
Bureau of Teacher Personn

Refused to sign

T. Per. 120 — (Rev. 2-72)
Com. No. G649

# FULL TIME BASIS SUBSTITUTE
# TEMPORARY TEACHER EFFICIENCY REPORT

353-98-26
330147

Name of Temporary Teacher Mr. Miss Mrs. Henderson, Michael D.

LAST, FIRST, MIDDLE, SOCIAL SECURITY NUM

Title of Temporary Certificate Elementary

ELEMENTARY — HIGH SCHOOL — SUBJECT

Name of School Nathan Hale     Position No. 14800     Area Region 11

Dates of Employment in this School: From 8-25-03     To Present

| PLEASE EVALUATE THE TEMPORARY TEACHER IN EACH OF THE FOLLOWING ITEMS: — (USE X MARK) — | SUPERIOR | EXCEL-LENT | SATIS-FACTORY | UNSATIS-FACTORY |
|---|---|---|---|---|
| **1. PERSONAL QUALITIES** | | | | |
| a. Punctuality | | ✓ | | |
| b. Attendance | | ✓ | | |
| c. Appearance | | | ✓ | |
| d. Speech (voice, diction, usage) | | | ✓ | |
| e. Judgment | | | ✓ | |
| **2. CLASSROOM ORGANIZATION** | | | | |
| a. Handles routine practices effectively | | | ✓ | |
| b. Keeps records accurately | | | ✓ | ✓ |
| c. Attractive classroom | | | ✓ | |
| **3. INSTRUCTIONAL SKILLS** | | | | |
| a. Preparation and planning ✱ | | | | ✓ |
| b. Evidence of competency in content areas | | ✓ | | |
| c. Provides for individual differences | | | ✓ | |
| d. Evaluates pupil progress | | ✓ | | |
| **4. TEACHER-PUPIL RELATIONSHIP** | | | | |
| a. Maintains good order | | ✓ | | |
| b. Motivates students to achieve success | | ✓ | | |
| **5. TEACHER-SCHOOL RELATIONSHIP** | | | | |
| a. Follows school policies ✱ | | | | ✓ |
| b. Shares in general responsibilities | | | ✓ | |
| c. Harmonious relations with teachers | | | ✓ | |
| **6. POTENTIAL AS A TEACHER** | | | ✓ | |

Your efficiency rating for the period from September 2003 to January 2004

is ➡ Satisfactory

Efficiency ratings for temporarily certificated Personnel are superior, excellent, satisfactory, and unsatisfactory. Unsatisfactory efficiency ratings shall be given in accordance with the procedures of Article 39-4.2 of the Agreement between the Board of Education and the Chicago Teachers Union.

Glenn L. Connell
SIGNATURE OF UNIT HEAD

Principal
TITLE

January 28, 2004
DATE

PERSONNEL COPY-WHITE . TEACHER'S COPY CANARY . REGION OFFICE COPY PINK . SCHOOL COPY GOLD

# EXHIBIT
# #
# 3



**ILLINOIS EDUCATIONAL LABOR RELATIONS BOA**

August 27, 2004

*EXHIBIT #3*

<u>**CERTIFIED MAIL**</u>

Mr. Michael Henderson
2728 W. Wilcox
Chicago, Illinois 60612

Re:    Case Name:   Chicago Board of Education
          Case No.:      2005-CA-0016-C

Dear Sir or Madam:

The charge which you filed with this office has been referred to Board Agent Dan Lyons 312/793-3170 in our Chicago office for investigation. Your case name and number appear above, and should be referred to when contacting our office.

Sometime during the next week, the Board Agent assigned to your case will contact you for the purpose of setting a date and time for you to come to our office to give a sworn statement concerning the events which caused you to file a charge. For your appointment, bring any documents or materials that are relevant to support your charge and claim.

**WE EXPECT ALL PARTIES TO COMPLY WITH THE TIME DEADLINES FOR SUBMITTING MATERIALS FOR THIS INVESTIGATION. REQUESTS FOR EXTENSION OF TIME ARE STRONGLY DISCOURAGED, AND WILL BE STRICTLY SCRUTINIZED. ALL SUCH REQUESTS MUST BE APPROVED IN ADVANCE BY THE EXECUTIVE DIRECTOR.**

Although there is no requirement that an attorney represent you, if in fact you are represented by counsel, please immediately advise the Board Agent of the attorney's name, address and phone number.

Sincerely,

Victor E. Blackwell
Executive Director

VEB:wrl
Enclosures

Internet Address: http://www.state.il.us/agency/ielrb
160 North LaSalle Street, Suite N-400 I Chicago, Illinois 60601-3103 I Telephone: 312/793-3170 I Facsimile: 312/793-3369
320 West Washington Street, Suite 260 I Springfield, Illinois 62701-1135 I Telephone: 217/782-9068 I Facsimile: 217/782-9331
TTY: 1-800/526-0844 (Relay)

 409-C

# EXHIBIT
# #
# 4



EXHIBIT
#4

5) Decisions of the Chief Executive Office may be appealed to arbitration under Article 3-5.

Article 3-3 **CHIEF EXECUTIVE OFFICER'S HEARING (at Labor Relations)**

1) Within 15 days after receiving the principal's decision, the grievant and/or the Union may appeal your decision to the Chief Executive Officer.

2) Labor Relations, acting for the Chief Executive Officer, schedules a hearing and invites the principal, grievant, union and any other parties who may have information relevant to the resolution of the grievance. This hearing must be scheduled within 10 school days of the Union's request.

3) Invited parties must receive at least two school days notice of the hearing, although, Labor Relations attempts to provide three or more days notice if possible.

4) Labor Relations shall make a written decision and communicate the same and the basis for the decision to the parties involved within 10 school days after completion of the conference.

## CONTRACT WAIVERS

Article 4-13; Page 29 of the contract

Restructured school day for closed campus only (20 minute lunch period)
Only teachers vote on this
Requires 67% majority to pass

Appendix C; Page 276 of the contract

Used for all other contract waivers
All CTU members at the school get to vote
Requires 50% majority plus one

## TEACHER PERFORMANCE RATING

Article 39; Page 143 of the contract
Grievances on rating process only

Two classroom visits required to form basis of rating. One of those visits must be by principal personally.

# EXHIBIT
# #
# 5

EXHIBIT
#5

T. Per. 123 — (Rev. 2-72)
Com. No. C643



CHICAGO PUBLIC SCHOOLS
Bureau of Teacher Personnel

# FULL TIME BASIS SUBSTITUTE
## TEMPORARY TEACHER EFFICIENCY REPORT

Name of Temporary Teacher  Mr. Miss Mrs.  *Henderson, Michael*  *D.*    353-98-2...  330 64 7...
LAST, FIRST  MIDDLE  SOCIAL SECURITY NUMBER

Title of Temporary Certificate  *Elementary*
ELEMENTARY                              HIGH SCHOOL — SUBJECT

Name of School  *Nathan Hale*    Position No. *14800*  Area Region *11*

Dates of Employment in this School:  From *8-25-03*    To *Present*

| PLEASE EVALUATE THE TEMPORARY TEACHER IN EACH OF THE FOLLOWING ITEMS: — (USE X MARK) — | SUPERIOR | EXCEL-LENT | SATIS-FACTORY | UNSATIS-FACTORY |
|---|---|---|---|---|
| **1. PERSONAL QUALITIES** | | | | |
| a. Punctuality | | ✓ | | |
| b. Attendance | | ✓ | | |
| c. Appearance | | | ✓ | |
| d. Speech (voice, diction, usage) | | | ✓ | |
| e. Judgment | | | ✓ | |
| **2. CLASSROOM ORGANIZATION** | | | | |
| a. Handles routine practices effectively | | | ✓ | |
| b. Keeps records accurately | | | ✓ | |
| c. Attractive classroom | | | ✓ | |
| **3. INSTRUCTIONAL SKILLS** | | | | |
| a. Preparation and planning | | | | ✓ |
| b. Evidence of competency in content areas | | ✓ | | |
| c. Provides for individual differences | | ✓ | ✓ | |
| d. Evaluates pupil progress | | ✓ | | |
| **4. TEACHER-PUPIL RELATIONSHIP** | | | | |
| a. Maintains good order | | ✓ | | |
| b. Motivates students to achieve success | ✓ | | | |
| **5. TEACHER-SCHOOL RELATIONSHIP** | | | | |
| a. Follows school policies | | | ✓ | ✓ |
| b. Shares in general responsibilities | | | ✓ | |
| c. Harmonious relations with teachers | | | ✓ | |
| **6. POTENTIAL AS A TEACHER** | | | ✓ | |

Your efficiency rating for the period from *September 2003 to January 2004*

is ➡ | *Satisfactory* |

*Dennise L Connell*
SIGNATURE OF UNIT HEAD

...ciency ratings for temporarily certificated Personnel are ...perior, excellent, satisfactory, and unsatisfactory. Unsatis-factory efficiency ratings shall be given in accordance with the procedures of Article 39-4.2 of the Agreement between the Board of Education and the Chicago Teachers Union.

THIS IS TO CERTIFY THAT THE
TITLE
INFORMATION IS BEING PROVIDED BY
*January 28, 2000*
CHICAGO PUBLIC SCHOOLS
EMPLOYEE RECORDS DEPARTMENT

PERSONNEL COPY-WHITE - TEACHER'S COPY CANARY - REGION OFFICE COPY PINK - SCHOOL COPY GOLD

# EXHIBIT
# #
# 6

EXHIBIT #6

## CLASS___ TEACHER VISITAT___ FORM
(Required)

Teacher's Name __Michael Henderson__ Room __Gym__ Date __11-10-03__

School __Dickin Park__ Subject/Grade __Gym (5th Gr)__

(Place a (✓) or brief comment in the appropriate column.)

| | Strength | Weakness | Does Not Apply |
|---|---|---|---|
| **I   Instruction** | | | |
| a) Provides written lesson plans and preparation in accordance with the objectives of the instructional program. | | | |
| b) Establishes positive learning expectation standards for all students. | ✓ | | |
| c) Periodically evaluates pupils' progress and keeps up to date records of pupils' achievements. | ✓ | | |
| d) Applies contemporary principles of learning theory and teaching methodology. | ✓ | | |
| e) Draws from the range of instruction materials available in the school. | ✓ | | . |
| f) Exhibits willingness to participate in the development and implementation of new ideas and teaching techniques. | ✓ | | |
| g) Provides bulletin board and interest areas reflective of current student work. | ✓ | | |
| h) Exhibits and applies knowledge of the curriculum content related to subject area and instructional level. | ✓ | | |
| i) Shows evidence of student performance and progress. | ✓ | | |
| **II   School Environment** | | | |
| a) Establishes and maintains reasonable rules of conduct within the classroom consistent with the provisions of the Uniform Discipline Code. | ✓ | | |
| b) Maintains attendance book(s), lesson plans, seating chart(s), and grade book accurately. | ✓ | | |
| c) Uses recommendations and suggestions from conferences and special education staffings. | ✓ | | |
| d) Encourages student growth in self-discipline and positive self-concept. | ✓ | | |
| e) Makes students aware of the teacher's objectives & expectations. | ✓ | | |
| f) Practices fairness in teacher-pupil relationships. | ✓ | | |
| g) Exhibits an understanding & respect for students as individuals. | | | |
| **III   Professional and Personal Standards** | | | |
| a) Presents an appearance that does not adversely affect the students' ability to learn. | ✓ | | |
| b) Demonstrates proper diction and grammatical usage when addressing students. | ✓ | | |
| c) Uses sound and professional judgment. | ✓ | | |
| **IV   Local School Unit Criteria** | | | |
| a) | | | |
| b) | | | |
| c) | | | |

**V   COMMENTS:**

-11-

## ADDITIONAL OBSERVATIONS
### (Required)

Teacher's Name __Michael Henderson__   Room __Gym__

School __Durkin Park__    Subject/Grade __Gym/5th Gr__

(Place a (✓) or brief comment in the appropriate column.)

| | | Strength | Weakness | Does Not Apply |
|---|---|:---:|:---:|:---:|
| **I** | **School-wide Environment** | | | |
| a) | Carries out daily routines and administrative requests. | ✓ | | |
| b) | Complies with the policies, rules, & regulations of the school system & of the building. | ✓ | | |
| c) | Participates in the program to improve student attendance. | | | ✓ |
| d) | Promotes anti-vandalism programs in the school. | | | ✓ |
| **II** | **Community Relationships** | | | |
| a) | Uses appropriate resources available in the community. | (N/A?) | | ✓ |
| b) | Initiates appropriate conferences with parents, administrators, and/or ancillary personnel, in accordance with school procedures. | ✓ | | |
| c) | Performs professional responsibilities in an atmosphere of mutual respect with parents & other community members. | ✓ | | |
| d) | Communicates the academic progress, attendance & conduct of students to their parents. | ✓ | | |
| e) | Endeavors to understand the lifestyles & values of the school community. | ✓ | | |
| | **Professional Responsibilities** | | | |
| a) | Is punctual & regular in attendance to school & duty assignments. | ✓ | | |
| b) | Participates in inservice meetings & uses information & materials provided. | ✓ | | |
| c) | Exhibits cooperative attitude toward students, parents, community, & school personnel. | ✓ | | |
| d) | Adheres to the Rules of the Board of Education & policies & procedures of the Chicago Public Schools & the local school unit. | ✓ | | |
| e) | Makes proper use of professional preparation periods. | ✓ | | |
| **IV** | **Local School Unit Criteria** | | | |
| a) | | | | |
| b) | | | | |
| c) | | | | |

**V**   Comments: _____

_____

_____

Evaluator: _Catherine Marunklus_
                        Signature

Teacher: _Mm. Henderson_
                        Date

-12-

# EXHIBIT

\#

7

EXHIBIT # 7

T. Per. (Rev. 2-72)
Com. No. G649

CHICAGO PUBLIC SCHOOLS
Bureau of Teacher Personnel

# FULL TIME
# TEMPORARY TEACHER EFFICIENCY REPORT

Name of Temporary Teacher  Mr. Miss Mrs.  Henderson, Michael  D  353-98-266

LAST  FIRST  MIDDLE  SOCIAL SECURITY NUMBER

Title of Temporary Certificate Secondary Teaching PE 09

ELEMENTARY  HIGH SCHOOL — SUBJECT

Name of School Durkin Park Elementary  Position No. 36125  Region 5 Area

Dates of Employment in this School: From August 2003  To June 2004

| PLEASE EVALUATE THE TEMPORARY TEACHER IN EACH OF THE FOLLOWING ITEMS: — (USE X MARK) — | SUPERIOR | EXCELLENT | SATISFACTORY | UNSATISFACTORY |
|---|---|---|---|---|
| **1. PERSONAL QUALITIES** | | | | |
| a. Punctuality | | | X | |
| b. Attendance | | | X | |
| c. Appearance | | | X | |
| d. Speech (voice, diction, usage) | | X | | |
| e. Judgment | | | | |
| **2. CLASSROOM ORGANIZATION** | | | | |
| a. Handles routine practices effectively | | | X | |
| b. Keeps records accurately | | X | | |
| c. Attractive classroom | | | X | |
| **3. INSTRUCTIONAL SKILLS** | | | | |
| a. Preparation and planning | | | X | |
| b. Evidence of competency in content areas | | X | | |
| c. Provides for individual differences | | | X | |
| d. Evaluates pupil progress | | | X | |
| **4. TEACHER-PUPIL RELATIONSHIP** | | | | |
| a. Maintains good order | | X | | |
| b. Motivates students to achieve success | | | X | |
| **5. TEACHER-SCHOOL RELATIONSHIP** | | | | |
| a. Follows school policies | | | X | |
| b. Shares in general responsibilities | | | X | |
| c. Harmonious relations with teachers | | | X | |
| **6. POTENTIAL AS A TEACHER** | | X | | |

Your efficiency rating for the period from August 28, 2003 to January 30, 2004

is ➜ [ Satisfactory ]

_Daniel Y. Redmond_
SIGNATURE OF UNIT HEAD

Principal
TITLE

1/27/04
DATE

Efficiency ratings for temporarily certificated Personnel are superior, excellent, satisfactory, and unsatisfactory. Unsatisfactory efficiency ratings shall be given in accordance with the procedures of Article 39-4.2 of the Agreement between the Board of Education and the Chicago Teachers Union.

PERSONNEL COPY-WHITE - TEACHER'S COPY CANARY - REGION OFFICE COPY PINK - SCHOOL COPY GOLD

# EXHIBIT
# #
# 8

EXHIBIT #8

CHICAGO PUBLIC SCHOOLS
Bureau of Teacher Personnel

# FULL TIME BASIS SUBSTITUTE
# TEMPORARY TEACHER EFFICIENCY REPORT

Name of Temporary Teacher (Mr.) Miss Mrs. Henderson, Michael D    Social Security Number 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

Title of Temporary Certificate: Secondary Teaching PE 09

Name of School Durkin Park Elementary   Position No. 36125   Region 5 Area II

Dates of Employment in this School: From August 2003 To June 2004

| PLEASE EVALUATE THE TEMPORARY TEACHER IN EACH OF THE FOLLOWING ITEMS: — (USE X MARK) — | SUPERIOR | EXCELLENT | SATISFACTORY | UNSATISFACTORY |
|---|---|---|---|---|
| **1. PERSONAL QUALITIES** | | | | |
| a. Punctuality | | | X | |
| b. Attendance | | | X | |
| c. Appearance | | | X | |
| d. Speech (voice, diction, usage) | | X | | |
| e. Judgment | | | | |
| **2. CLASSROOM ORGANIZATION** | | | | |
| a. Handles routine practices effectively | | | X | |
| b. Keeps records accurately | | X | | |
| c. Attractive classroom | | | X | |
| **3. INSTRUCTIONAL SKILLS** | | | | |
| a. Preparation and planning | | | X | |
| b. Evidence of competency in content areas | | X | | |
| c. Provides for individual differences | | | X | |
| d. Evaluates pupil progress | | | X | |
| **4. TEACHER-PUPIL RELATIONSHIP** | | | | |
| a. Maintains good order | | X | | |
| b. Motivates students to achieve success | | | X | |
| **5. TEACHER-SCHOOL RELATIONSHIP** | | | | |
| a. Follows school policies | | | X | |
| b. Shares in general responsibilities | | | X | |
| c. Harmonious relations with teachers | | | X | |
| **6. POTENTIAL AS A TEACHER** | | X | | |

Your efficiency rating for the period from August 28, 2003 to January 30, 2004

is ➔ Satisfactory

Daniel J. Redmond
SIGNATURE OF UNIT HEAD
Principal

Efficiency ratings for temporarily certificated Personnel are superior, excellent, satisfactory, and unsatisfactory. Unsatisfactory efficiency ratings shall be given in accordance with the procedures of Article 39-4.2 of the Agreement between the Board of Education and the Chicago Teachers Union.

THIS IS TO CERTIFY THAT THE INFORMATION IS BEING PROVIDED BY CHICAGO PUBLIC SCHOOLS EMPLOYEE RECORDS DEPARTMENT COPY

PERSONNEL COPY-WHITE - TEACHER'S COPY CANARY - REGION OFFICE COPY PINK - RECORDS DEPARTMENT

# EXHIBIT
# #
# 9

Exhibit #9



**CHICAGO PUBLIC SCHOOLS**

Arne Duncan, Chief Executive Off

**Office of Labor and Employee Relations**

Cheryl J. Colston
Director

Sharon Ba
Thomas A. Kric
Thomas M. Ov
Steffanie L. Pi
Kishasha Williams-
Reshorna M. Wo

Curtis L. Goodman
Assistant Director

May 24, 2004

Michael Henderson
2728 West Wilcox
Chicago, Illinois 60612

Dear Mr. Henderson:

An Investigatory conference will be convened on **May 27, 2004 at 11:30 a.m.,** in the Office of Labor and Employee Relations, 125 South Clark Street, 13th Floor, to discuss a matter which could affect your employment.

This conference is based on an allegation that you were belligerent, confrontational and exhibited a threatening posture toward the principal while substituting at Westinghouse Career Academy. You had to be escorted from the school by the police.

Please be advised that if you wish, you may be represented by one person of your choice at this conference. It is your responsibility to arrange the attendance of your representative.

If you have any questions regarding your attendance, you may contact Flavio Parra at (773) 553-1197.

Sincerely,

Cheryl J. Colston
Director of Labor Relations

CJC:FP:gg

cc:    Nancy Slavin
Angela Simpson
David Friedman

---

I received the original letter on this _26_ day of _May_ _____ 2004.

Michael Henderson
Michael Henderson

# EXHIBIT
# #
# 10

# Chicago Public Schools Policy Manual

| | |
|---|---|
| **Title:** | LIFE SAFETY AND PROPERTY LOSS PREVENTION |
| **Section:** | 409.2 |
| **Board Report:** | 03-0723-PO01 |
| **Date Adopted:** | July 23, 2003 |

**Policy:**

The Bureau of Safety and Security, the Bureau of Risk and Benefits Management and the Office of Schools and Regions are to update, publish and distribute the *Safe School Plan* and the *Emergency Management Plan* every two (2) years.

The Bureau of Safety and Security and the Bureau of Risk and Benefits Management will provide an annual evaluation of the system-wide Life Safety and Property Loss Prevention programs.

The Department of Operations, in consultation with the Bureau of Safety and Security, will develop and implement a *Safe Building Plan* for the Central Service Center, region and/or area offices and other office and warehouse sites. Implementation of the plan will include annual emergency drills.

The Bureau of Safety & Security, the Bureau of Risk and Benefits Management and the Department of Operations shall develop and review procedures for tracking property losses and replacing lost or damaged property as appropriate. These procedures shall be reviewed every two (2) years.

In schools, the principal will annually develop and implement a *Safe School Plan* and an *Emergency Management Plan* for the school in cooperation with the Bureau of Safety and Security. Plans will be submitted to the Bureau of Safety and Security and to the Area Instructional Officer by October 1st of each school year.

The plans shall include the provisions for instructing staff and students on their roles in an emergency and in conducting emergency drills. School plans will include safety education instruction to students on appropriate safety precautions for both school and play (105 ILCS 5/27-17).

Administrators and supervisory personnel at all levels will be responsible for the implementation and maintenance of an on-going comprehensive Life Safety and Property Loss Prevention program in the areas under their jurisdiction. Further, schools must be in compliance with all applicable building and fire code provisions. In the event of a code violation, the school will promptly follow the procedures set forth by the Department of Operations Asset Management.

| | |
|---|---|
| **Amends/Rescinds:** | Rescinds 87-0527-PO1 |
| **Cross References:** | |
| **Legal References:** | 105 ILCS 5/27-17 |



# EXHIBIT
# #
# ||



# Trespasser

A trespasser in the building is any individual who has not followed established visitor procedures. Whether the trespasser's intentions are good or bad, he/she should be dealt with immediately and his/her purpose in the school should be ascertained.

## Procedures

1. Upon encountering a trespasser, ask whether you can assist the individual and request that he/she sign in at the office.

2. Escort the visitor to the office if possible. Do not leave a classroom unsupervised. Any trespasser who is identified, but not personally escorted by a staff member, should be reported to the office via the intercom system, radio, etc.

3. If a trespasser refuses to follow procedures, contact 911 immediately. Give a description of the trespasser:

    a. Height

    b. Weight

    c. Age (approximate)

    d. Race

    e. Description of clothing

    f. Hair color/characteristics

    g. Eye coloring

    h. Distinctive markings— e.g., scars, tattoos

    i. Voice

4. If the location of trespasser is not known, Administrator-in-Charge announces "All visitors must report to the school office immediately."

5. If the trespasser does not respond and is still known to be in the building, call 911. Consider a "Code Red."

6. If trespasser is outside the building, but on school grounds, consider a "Code White."



# EXHIBIT
# #

# 13

Case: 1:05-cv-00069 Document #: 1 Filed: 01/05/05 Page 42 of 79 PageID #:42

- Is the disciplinary action supported by appropriate documentation which:

  - Is factual and concise?

  - contains a clear description of the conduct which prompted the hearing, i.e., dates, times, locations, people involved, witnesses (if appropriate) and other relevant circumstances or contributing factors?

  - Includes copies of letters, memos, etc. received by the employee indicating that earlier attempts were made to counsel the employee, and that suggestions for improvement to assist the employee in remediating the conduct were offered? Include verbal warnings, if given. The documentation of a verbal warning need not be given to the employee, but should be noted in the employee's school file.

    - provides detailed information regarding specific allegations of misconduct, i.e., summary of facts, citing which Board Rule or policy was allegedly violated? Include copies of official reports, i.e., incident and assault reports, police reports, written findings of investigations by the Department of Children and Family Services, etc., if applicable.

- Is the disciplinary action supported by testimony or statements from credible witnesses?

- Does the imposed discipline follow the guidelines of the Employee Discipline Code?

Based on the review, the Reviewing Officer shall do the following:

- Approve the disciplinary action imposed by the administrator **or**

- Disapprove the disciplinary action imposed by the administrator.
  Result: Increase or reduce the severity of the disciplinary action, as warranted by the facts

After reviewing the case, the Reviewing Officer must take the following actions:

- Complete Review of Disciplinary Action
- Forward Review of Disciplinary Action to Labor and Employee Relations
- Complete Notice of Disciplinary Action (Reviewing Officer's Decision)
- Forward Notice of Disciplinary Action (Reviewing Officer's Decision) to Labor and Employee Relations and employee and administrator. The employee's notice shall be personally served in a private place, or sent to the address of record, via certified mail
- For review of suspensions of 6 to 15 days only, complete Discipline Hearing Summary and forward to Labor and Employee Relations

# EMPLOYEE DISCIPLINE

## DUE PROCESS PROCEDURES

These procedures were developed to assist administrators in implementing Board Policies #95-1025-PO1, #95-1025-PO2, and #95-1025-PO8, relative to the discipline and discharge of teachers and educational support personnel.

### Before Disciplinary Action is Initiated

All disciplinary action must be supported by appropriate documentation. The documentation must:

- be factual and concise

- contain a clear description of the conduct which prompted the hearing, i.e., dates, times, locations, people involved, witnesses (if appropriate) and other relevant circumstances or contributing factors.

- Include copies of letters, memos, etc. received by the employee indicating that earlier attempts were made to counsel the employee, and that suggestions for improvement to assist the employee in remediating the conduct were offered (when applicable). Include verbal warnings, if given.

- provide detailed information regarding specific allegations of misconduct, i.e., summary of facts, citing which Board Rule or policy was allegedly violated. Include copies of official reports, i.e., incident and assault reports, police reports, written findings of investigations by the Department of Children and Family Services, etc., if applicable.

## Pre-Discipline Hearing

### Scheduling the Pre-Discipline Hearing

All employees must receive written notification that a pre-discipline hearing is being convened and should sign a copy of their notice acknowledging receipt. Employees have the right to have union representation during the conference. Teachers and educational support personnel represented by the Chicago Teachers Union (CTU) are responsible for notifying the union. However, pursuant to the Board's labor agreements, the administrator must notify all non-CTU unions, by written notice, a minimum of two working days prior to the hearing. (See Union Representation per Job Title)

The written notification provided to employees and the Unions must indicate:

- the time, date, and place of the hearing
- the alleged misconduct which led to the scheduling of the hearing
- that the hearing may result in disciplinary action
- the range of disciplinary actions which may be administered or recommended

## Before the Pre-Discipline Hearing

If requested, copies of all documentation supporting disciplinary action must be made available to the Union representative. Any additional documentation of incidents occurring after the Union has received the materials, but prior to the hearing, must also be given to the Union representative two days before the hearing. This action must be taken if the administrator plans to address those incidents/misconduct during the hearing.

## Day of Pre-Discipline Hearing

- The pre-discipline hearing shall be conducted by the administrator in a place ensuring privacy.

- The administrator shall read, verbatim, the employee's notice of the pre-discipline hearing.

- The administrator shall then afford the employee, or the employee's representative, an opportunity to respond, either orally or in writing, and to present an explanation of the applicable facts and circumstances.

- Any statements of witnesses presented by the employee must be in writing.

- At the conclusion of the hearing, the administrator shall inform the employee that a written notice of disciplinary action, if any, will be given to the employee in a timely manner.

## After the Pre-Discipline Hearing

After the administrator determines what, if any, disciplinary action will be imposed, the administrator must:

- Complete the Notice of Disciplinary Action. The notice must be:
  - typed
  - personally served on the employee in a place ensuring privacy or sent to the employee, via certified mail, to the employee's last known address.

- Complete, type and forward the Discipline Hearing Summary, the documentation that supports the disciplinary action, and the Notice of Disciplinary Action to the Regional Education Officer and Labor and Employee Relations.

## Processing Appeals

### After the Pre-Discipline Hearing

All employees have the right to appeal the administrator's decision to suspend the employee without pay for one to fifteen days, within five working days of receipt of the decision. The following delineates procedures which must be followed based on the duration of the suspension.

### Review of Suspensions of 1 to 5 Days, and 6 to 15 Days

- Teachers must forward letters of appeal to the Regional Education Officer of their respective regions.

- Educational support personnel must forward letters of appeal to Labor and Employee Relations.

- Upon receiving the letter of appeal, the Regional Education Officer, or a designee serving as the Reviewing Officer, will:

  - 1 to 5 Days - review the completed Discipline Hearing Summary and supporting documentation received from the administrator, plus any written rebuttal from the employee, statements from witnesses, or other documents forwarded for consideration.

  - 6 to 15 Days - in addition to the foregoing, conduct a Review Hearing at which witnesses are permitted to testify orally. The Reviewing Officer must follow the same procedures used by administrators in scheduling and convening the Pre-Discipline Hearing, and determining the appropriate disciplinary action.

The Reviewing Officer should consider factors including, but not limited to, the following:

- Did the employee receive written notification that a pre-discipline hearing was scheduled?

- Did the written notification provided to the employee indicate:

  - the time, date, and place of the hearing?

  - the alleged misconduct which led to the scheduling of the hearing?

  - that the hearing may result in disciplinary action?

  - the range of disciplinary actions which may be administered or recommended?

# EXHIBIT
# #
# 14

*Exhibit # 14*

# DEPARTMENT OF HUMAN RESOURCES   CPS SCHOOL DIRECTORY 2003 - 04

## SUBSTITUTE EMPLOYEE GUIDELINES, POLICIES, AND PROCEDURES

1. To remain active as a Chicago Public Schools substitute employee, you must work at least once every 90 days. If you do not work, your enrollment may be cancelled. You may be subject to re-enrollment. If a substitute employee does not work for one year or more, a new Medical/TB test and background check must be completed before they can return to work. If you work after your enrollment has been cancelled, you may not be paid for time worked until you are re-enrolled.

2. To receive an assignment, you must call (773) 553-1080, the day before you would like to teach to report your availability for work. WE DO NOT CALL YOU FOR ASSIGNMENT, UNLESS YOU REPORT YOUR AVAILABILITY. We are open 24 hours a day/7 days a week to accept your availability calls.

3. If you arrive late for a substitute assignment at a school without Substitute Services authorization, your salary may be docked. Substitute employees can only work on student attendance days. Reporting to schools on days when students are not in attendance or without prior authorization from Substitute Services may result in no pay for that day. Please use the school year calendar included in your information packet for the days of no student attendance. (Examples: Report Card Pickup, Teacher Professional Development, Teacher Institute Days) *these plural*



4. Performance issues/incident reports about your conduct at the school sites may result in an investigation and/or hearing to determine your employment status. Substitute employees are subject to the Chicago Public Schools Employee Discipline Code. A copy of this code is available for review in Substitute Services, 125 South Clark Street, 2nd floor, or the Bureau of Labor and Employee Relations, 125 South Clark Street, 13th floor, Chicago, Illinois 60603, (773) 553-1200.

5. Board policy mandates 6 hours of unpaid training for substitute employees. Please call Teachers Academy at (773) 553-6050 for more information and class schedules. PLEASE NOTE: CHICAGO PUBLIC SCHOOLS PENSIONERS ARE EXEMPT FROM THIS REQUIREMENT.

6. Substitute employees must carry their Chicago Public Schools Photo Identification Card when they report to work. Failure to display this identification card may result in no work for that day. If your identification card is lost, please report it immediately to Substitute Services. A replacement identification card may be issued with approval and the payment of a fee at 125 S. Clark St.

7. Swiping IN and OUT on the KRONOS time clock is required to assure accurate salary. Signing in on a sheet does not replace KRONOS swipes. Please press F1 and swipe your photo id through the KRONOS time clock. If your photo id does not work properly, press F1 and punch in your social security number using the keypad. Forgetting to swipe in and out may cause loss of pay and a delay in receiving salary for the day.

8. Keep track of your daily assignments and the position numbers on a calendar. When you receive your paycheck, match the position numbers with days worked. Please ask the school clerk for the position number of the teacher who is absent before you leave the school for the day.

9. Retroactive pay will not be issued for a status change. Status changes are effective from the date approved, not the date submitted. *fr*

10. Substitute employees must have a valid Illinois State Board of Education certificate. Check www.isbe.net for more information.

11. Call Payroll at (773) 553-6110 for questions about your paycheck or deductions. Web Timecard access instructions are included in your information packet to allow you to track your payroll.

12. Substitute employees are temporary employees and are not eligible for leaves of absence.

13. Employment verification is available by written request only. The original letter of verification of employment will be mailed directly to the company, organization or person requesting verification of the employee s (current or past) employment status as a Substitute Employee. Depending on the nature of the request, employment verification may take 3-60 days if research is required. NO verification information will be sent without a signed, written approval for release.

14. If 5 days or more are worked in a pay period, a pension deduction is automatic. Your pension contribution can be refunded from the Pension Board 60 days after resignation from the Chicago Board of Education.

15. Employees are responsible for reporting for change in status (Example: hired as permanent, left area etc), change of name, address or telephone number to Substitute Services. You are also responsible for updating your personnel record with Employee Records.

# EXHIBIT

# #

15

Exhibit # 15

Deborah Lynch
*President*
Howard L. Heath
*Vice President*
Jacquelyn Price War
*Recording Secretary*
James H. Alexander
*Financial Secretary*
Maureen Callaghan
*Treasurer*

*Trustees*
Thomas J. Billups
Mary Pat Finn
Rose Mary Finnegan
Mary Patricia Greco
Allegra Podrovsky
Leandres White

*Affiliations*
American Federation of
Teachers, Illinois Feder:
of Teachers, American
Federation of Labor -
Congress of Industrial
Organizations, Illinois
Federation of Labor -
Congress of Industrial
Organizations, and Chic
Federation of Labor,
Industrial Union Counci

June 29, 2004

To Whom It May Concern:

Mr. Michael Henderson, a cadre substitute, was terminated on June 17, 2004. Since Mr. Henderson was a cadre substitute, he is an at will employee of the Board of Education and is not entitled to any other hearing except an Invesitgatory Conference, which took place on May 27, 2004.

The Chicago Teachers Union cannot file a grievance on this issue.

*→This was a lie, see ⇒Exhibit # 16 & 17*

Sincerely,

David B. Friedman
Field Representative

DBF/oteg-743/kt

222 Merchandise Mart Plaza  •  Suite 400  •  Chicago, Illinois 60654-1016  •  312/329-9100  http://www.ctunet.c

# EXHIBIT

# #

16

**Chicago TEACHERS UNION**

*Exhibit # 16*

Marilyn Stewart
*President*

Theodore T. Dallas
*Vice President*

Mary A. McGuire
*Recording Secretary*

Mark A. Ochoa
*Financial Secretary*

Linda C. Porter
*Treasurer*

*Affiliations*
American Federation of
Teachers, Illinois Fed
of Teachers, American
Federation of Labor -
Congress of Industrial
Organizations, Illinois
Federation of Labor -
Congress of Industrial
Organizations, and Ch
Federation of Labor,
Industrial Union Cour

September 23, 2004

Ms. Cheryl Colston
Director
Office of Labor/Employee Relations
Chicago Public Schools
125 South Clark Street
Chicago, Illinois 60603

RE: Article 3-6
Michael Henderson
Substitute Teacher, Hale
Case #04-09-261(crd)
Subject: Articles 3 and 39-4.3

Dear Ms. Colston:

In accordance with the provisions of Article 3-6 of the Agreement between the Board of Education of the City of Chicago and the Chicago Teachers Union, this grievance is filed by Chicago Teachers Union on behalf of the above-named bargaining unit member.

Mr. Michael Henderson contends that there has been a violation of Article 39-4.3 of the Board/Union Agreement, which states that a temporarily certificated teacher employed on a day-to-day basis shall not be terminated until said teacher has been given an unsatisfactory rating by at least two principals, unless there is evidence of moral laxity or serious misconduct. Mr. Henderson did not commit a serious act of misconduct, nor did he act in a manner indicative of moral laxity.

The records indicate that Mr. Henderson was terminated without the Department of Human Resources scheduling any conference with said teacher to discuss the reasons for their dissatisfaction with his performance and to give him positive suggestions for improvement, as indicated in Article 39-4.3. Moreover, Mr. Henderson's personnel file indicates that he has never received an unsatisfactory rating from 1998 to the present. Furthermore, this is the first incident against Mr. Henderson.

In order to resolve this matter, we are requesting that Mr. Henderson's termination be rescinded and that he be allowed to continue as a substitute teacher with the Chicago Public Schools.

Your assistance with this problem as stipulated in Article 3-6 will be appreciated.

Sincerely,

*Marilyn Stewart*

Marilyn Stewart
President

MS:CRD/oteg-743/kt
cc: Michael Henderson

222 Merchandise Mart Plaza • Suite 400 • Chicago, Illinois 60654-1016 • 312/329-9100 http//:www.ctune

# EXHIBIT
# #
17

Exhibit #17

## Chicago TEACHERS UNION

October 18, 2004

Marilyn Stewart
*President*
Theodore T. Dallas
*Vice President*
Mary A. McGuire
*Recording Secretary*
Mark A. Ochoa
*Financial Secretary*
Linda C. Porter
*Treasurer*

*Affiliations*
American Federation of
Teachers, Illinois Federation
of Teachers, American
Federation of Labor -
Congress of Industrial
Organizations, Illinois
Federation of Labor -
Congress of Industrial
Organizations, and Chicago
Federation of Labor,
Industrial Union Council

Mr. Michael Henderson
2728 West Wilcox
Chicago, Illinois 60612

Dear Mr. Henderson:

This document serves to keep you informed about the progress of your grievance. We will keep you informed in this manner by transmitting to you copies of correspondence that we send and receive. However, if the Board or your local administrator is mailing a decision or meeting notice to you, we will not duplicate the effort.

It is necessary that you be present at all hearings. As soon as you receive your notification, you should show it to your principal and she/he is expected to provide for your absence. This is school business and you are to be released without any loss. Should a scheduled hearing present you with difficulties, notify your field representative.

After you receive a decision, you should immediately confer with the field representative handling your case. Together, you must decide if the decision is satisfactory or if the facts and circumstances of the case warrant appeal. Please note that time limits exist for appeals at each level. It is your responsibility to contact the field representative in sufficient time to prevent your case being lost by default. These time limits are:

### TIME LIMITS FOR RESPONSES

| FILING LEVEL | HEARING | WRITTEN RESPONSE |
| --- | --- | --- |
| Local School Principal (3-1) | 3 School Days | 3 School Days After Hearing |
| Labor Relations (3-6) | No Hearing Necessary | 15 School Days |
| General Superintendent (3-3) | 10 School Days | 10 School Days After Hearing |

### TIME LIMITS FOR APPEALS

| APPEAL FROM | TO | TIME LIMITS |
| --- | --- | --- |
| Local School Principal (3-1) | General Superintendent (3-3) | 15 School Days |
| General Superintendent (3-3) | Arbitration (3-5)/Mediation (3-8) | 15 School Days |
| Employee Relations (3-6) | General Superintendent (3-3) | 15 School Days |
| General Superintendent (3-3) | Arbitration (3-5)/Mediation (3-8) | 15 School Days |

Any telephone calls or inquiries concerning your case should be made to Ms. Colleen Dykas, (312) 329-9100.

Sincerely

Marilyn Stewart

Marilyn Stewart
President

MS:CRD
oteg-743/kt

22 Merchandise Mart Plaza • Suite 400 • Chicago, Illinois 60654-1016 • 312/329-9100 http//:www.ctunet.com

# EXHIBIT

\#

18



Exhibit
#18



**CHICAGO PUBLIC SCHOOL**

_____ _____, Chief Executive Offic

**Office of Labor and Employee Relations**

Cheryl J. Colston
Director

Curtis L. Goodman
Assistant Director

Sharon Bail
Thomas A. Krieg
Thomas M. Owe
Steffanie L. Pins
Kishasha Williams-Fc
Reshorna M. Woffc

July 7, 2004

Michael Henderson
2728 West Wilcox
Chicago, Illinois 60612

Dear Mr. Henderson:

I write in response to your correspondence dated June 19, 2004, wherein you request that this office reconsider our decision to terminate your employment. You allege that termination was too harsh a punishment, given the facts of your case and the lack of prior discipline in your file.

Be advised that the decision to terminate your employment was based solely on the facts presented at your May 27, 2004 hearing, including everything that you and your union representative said and the materials provided by your former principal and the Office of Substitute Services. Termination of employment is always a potential result of an investigatory conference. In making this decision, we look not only at an individual's employment history, but at the severity of the conduct at issue, as well. In your case, it was determined that your conduct was egregious enough to warrant your termination, regardless of your history.

Therefore, I regret to inform you that our decision to terminate your employment must stand.

Sincerely,

Cheryl Colston

CC:tak

Cc:    David Friedman

125 South Clark Street, 13ᵗʰ Floor • Chicago, Illinois 60603
Telephone (773) 553-1200 • FAX (773) 553-1201

_Children First_

# EXHIBIT
# #
# 20

*EXhibit # 25*

# HEARING OFFICER'S CONFERENCE SUMMARY

**SUBJECT:** Synopsis of the investigatory conference held on May 27, 2004, in the Office of Labor and Employee Relations for Michael Henderson, Cadre Substitute Teacher.

**TIME OF CONFERENCE:** 11:30 a.m.

**PARTICIPANTS:**

Kishasha Williams-Ford, Hearing Officer, Labor and Employee Relations
Michael Henderson, Day-to-Day Substitute Teacher *( Displaced FTB)*
David Friedman, Field Representative, Chicago Teachers Union

Mr. Henderson was summoned for an investigatory conference based on the allegation that on May 17, 2004, he was belligerent, confrontational and exhibited a threatening posture while substitute teaching at Westinghouse Career Academy. Additionally, Mr. Henderson had to be escorted from the school by police.

Mr. Henderson began the hearing indicating that he "deserves respect from any and anyone, whether it is a drunk on the street begging for change or the President of the United States, who has the power to start another war." He stated that he "deserves respect from any and everybody."

Mr. Henderson stated that he has taught six years. He stated that he has been a displaced teacher since February 2004 and has been substitute teaching. He indicated that since that time he has "been talked down to by school clerks and teachers making false claims against him." He claimed that students have even threatened him with bodily harm. *and fail to get paid on several occasions*

Mr. Henderson denied that he was belligerent, confrontational and exhibited a threatening posture on May 17, 2004. He said that he does not hit women, but grew up in a home with domestic violence. He stated that he did not curse at or was violent with the principal of the school. He indicated that in a previous teacher evaluation it was noted that he was "argumentative." He indicated that he has since learned how to change this negative behavior to a positive one. At that point, Mr. Henderson submitted to the Hearing Officer, several copies of evaluations and letters of recommendation. He states that instead of arguing with people, he now "writes people up." He states that he "doesn't have to get violent or belligerent on the job." He states that he "now just writes people up" and gives the report to the person's supervisor.

Mr. Henderson stated on May 17, 2004, the principal of Westinghouse confronted him with the idea that he was not doing any work in the accounting class, in which he substituted. He said that he reviewed the school's attendance reporting protocol with the clerk. He further indicated he mentioned this interaction with the clerk to illustrate the he was "all about earning his paycheck." He stated that during one of the classroom periods he called the security guard for assistance in gathering playing cards from students that were playing cards. He stated the guard did not intervene and told him to 'forget about it and let it go." He further indicated that he shared this incident to show the he "was about earning his paycheck." He stated that one student walked out of the classroom and he wrote the student up.

Mr. Henderson said that during fourth period, his preparation period, he placed on his headphones and listened to a gospel CD and read his book. He stated that he was in a positive mood because he was listening to positive music. He said when sixth period began, he did not allow the students to sign in first.

He indicated that all the students walked out of the classroom and he was left alone. He stated that after the students left the classroom during sixth period, he resumed listening to his CD and reading his book. He stated that during this time the school clerk walked by the classroom and requested that he take off the headphones. He said that he told the clerk that it shouldn't be a problem because the students had left the classroom. He stated the clerk begin to explain that the principal of the school did not allow personnel to listen to headphones. He said that he took the head phones off and resumed reading his book. He stated that he sat in a swivel chair and placed his foot on the lower wall and read his book.

Mr. Henderson stated that the principal entered the room and saw him reading the book. He indicated that the principal in an "angry and mean tone" stated that he was not earning his paycheck. He indicated that he told the principal, "How can I do work when there were no students in the class?" He claimed that the buzzer did not work and he could not report the students left. He also stated at no time did he leave the classroom and report that the students left the classroom. He stated that he did not report the students' departure to the security guard because the guard was stationed outside of his classroom. He stated the principal then exclaimed "You should have reported the students leaving the classroom to the attendance officer" He stated that he explained to the principal that he did not have the classroom roster or lesson plans. He stated that he then asked the principal "Do you talk to all your subs that way?" Mr. Henderson then reported the principal replied "I have a witness that you are not doing any work." He indicated that the principal's comment was a threatening statement about him not doing any work. He stated that he had to remain in the room to get a full day's pay. He indicated that a few words were exchanged with the principal about his potential employment at another school. *I did not know where the attendance office was at and felt she would black mell me*

Mr. Henderson stated that while they are talking he remained seated and the principal looked down on him. He indicated that when a person looks down upon you that they are in a position of power. Next the principal told him that he "would have to go." He stated that at that point he stood up and asked if he would get paid for the day. She stated that she was not sure. He then stated that he sat back down and refused to leave because he needed a full day's pay. He stated that the principal left the classroom. He stated that he assumed that the principal felt threatened because "he was big and black and was not intimidated by her title." He also stated the principal " had succumb to the stereotype that big black men can become violent."

Mr. Henderson stated that the principal's tone was inappropriate. He indicated that the principal left the classroom and later entered with a police officer. He said that the police officer "did not scare him into leaving." He stated that he initially refused to leave because he needed a "full day's pay." He stated that he did not believe the principal had the right to tell him to leave the building because he thought Substitute Services was his direct supervisor. He stated that the principal approached him in "an angry and intimidating manner, with a disrespectful attitude and that the situation was not right." He stated that he substituted at Westinghouse about thirteen times. *not this , but over several years*

Mr. Henderson stated in closing, that he is not an arrogant person who does not follow directions. He stated that he has learned "that when a principal asks you to leave and even though they are belittling, with a nasty attitude" that you "should just leave the building."

Hearing Officer's Comment:
I find that Mr. Henderson was belligerent and confrontational toward the principal of Westinghouse Career Academy. It is also likely that he exhibited a threatening posture while refusing to leave the school building as requested by the principal.

In a review of the documentation submitted by Mr. Henderson, I found that he has a history of being argumentative and has a problem with following directives of superiors. In a January 2004 evaluation

*—, was not given a chance to explain and did not sign this evalua*

submitted by Mr. Henderson, one supervisor indicated that he was "unsatisfactory" in following school policies. Another evaluation with a different supervisor indicated that Mr. Henderson was "argumentative with colleagues." I believe that Mr. Henderson was belligerent and confrontational with the principal of Westinghouse. Mr. Henderson by his own admission stated that he initially refused to leave the building at the principal's request. It was not until the police were summoned that he left the building. The mere fact the police had to be summoned is evidence of his confrontational and argumentative nature.

In the hearing, Mr. Henderson did not take any responsibility for his actions or the part he may have played in the interaction with the principal of the school. He accuses the principal of talking to him with an angry tone and he thereafter had to defend his "right" to remain in the building after being asked to leave. It is apparent that Mr. Henderson has difficulty with authority figures. He argued that he did not understand that the principal of the school in which he worked was his supervisor while he substituted in the school. That excuse is unreasonable. Mr. Henderson having taught and substitute taught with the Chicago Public Schools for six years, and should have known to leave the building at the principal's request. Moreover Mr. Henderson should not have been confrontational with the principal regarding the matter of leaving the building.

*all lies*

In addition, though not charged, Mr. Henderson was derelict in his duties as a substitute teacher. He failed to report the absence of his entire class once he allowed the students to leave his classroom. He made no report of students that left his classroom, but sat in the classroom reading and listening to music with headphones. This behavior is negligent and unbecoming a teacher. The Board does not condone behavior that is not conducive to the orderly educational process of the school. *gave reasons to the pe*

Mr. Henderson was concerned about "earning his pay" for the day. Mr. Henderson felt justified in his refusal in leaving the building. It is likely that Mr. Henderson would in another situation with an administrator display similar behavior when faced with philosophical or pedagogical differences. It is for this reason I recommended that Mr. Henderson be terminated effective immediately. Additionally, Mr. Henderson's employment file should be coded that he is not eligible for rehire in the system.

Submitted by:

Kishasha Williams-Ford, Hearing Officer      Date: 6/16/04

Approved by:

Cheryl J. Colston, Director of Labor and Employee Relations      Date: 6-16-04

# EXHIBIT
# #
21

From: Michael Henderson                    May 27, 2004
To: Hearing officer (FORD)
Regards To: Westinghouse incident        Exhibit #21

~~I Never cursed or got violent~~

On May 17, 2004, I was given an assignment to work at Westing House Highschool.

When I arrived at the school, the office clerks welcomed me with a warm attitude. After swiping in, they sent me upstairs to cover Mr. Richardson classroom, because they said he was running late. I asked them did he leave any work, they said I wouldn't need any. Moreover, they told me to come back down stairs when he (Mr. Richardson) arrived. When Mr. Richardson arrived, I went back to the office as the clerk asked me to.

When I got back into the office, a clerk w/Baring glasses gave me work (newspapers and worksheets pertaining to the newspaper articles) for the pupils to work on. After receiving the work, I asked the clerk a few questions pertaining to disciplining the students:
A) Do I let pupils in w/o a ~~tardy~~ pass? Yes
B) Do I allow pupils to use the rest room? yes, (but give them a pass)
C) Do I check I.D.s? yes

②

I stated : this information, to show and help y'all understand that I was about doing work to earn my paycheck.

After gathering the work, I proceeded to Room 111. When I arrived in the room, another sub was sitting in the room drawing pictures of one of the female students. At the end of the period, a clerk told this day to day sub (at Westing House) to leave and go somewhere else and I took her substitute spot.

The pupils who came in, where to stay in this period for 2nd and 3rd periods. I gave the pupils the work from the clerk, and they told me that Mr. Anderson already gave them work. I told them that this work would be turned in for extra credit. During the start of the class, I asked the security guard (pupils called her "Bettle Juice") to assists me with pupils who had no I.ds, And to help me get a pack of playing cards from a group of girls. She suggested and I did write up one pupil (Dante Lewis), who did not have an Identification card and left without my permission. I wrote this pupil up and sent it to Room 050.

③

Once again, I write this information to prove to y'all that I was about earning my paycheck. Moreover, only one person finished and turned in this work.

During my prep period, I listened to my head phones, read a book and did a crossword puzzle. No one said anything to me.

When 6TH, 7TH, 8TH period came (I would have these pupils for the rest of the day). I told pupils as they came in, I would not allow them to sign in until 2:30 pm, because I did not want them walking out on me. So, three pupils came in and sat for about 5 minutes, and five came in and left immediatly. The three pupils eventually got up and left. Even though I gave them the assignments, they still left.

So I had no pupils in the classroom, but I stayed in the classroom, thinking some pupils might show up late.

So, I put my headphones on, and started listening to my T-Bone (Gospel funkadelic music) tape. 10 minutes into listening to the tape, a woman (who I assume to be an office clerk) told me to take off the head phones,

What u hear, s... winco... out of ...

(4)

~~I then told her, since I had no pupils it shouldn't be a problem. She~~ then said "our principal doesn't allow staff to listen to headphones. If you want to listen to headphones you have to go to the teacher's lounge. I said okay, and then I took the headphones off. I then began reading my book "The Battle Is THE LORD'S" by Tony Evans. While reading my book, I slightly proped my foot on the wall, to hold my balance so I wouldn't fall back and out of the chair. Thirty minutes into reading my book, this woman comes in and ask me "who are you sir?"

I told her I am MR. Henderson and I am subing for MR. Anderson. She then said "you are not earning your pay check, with your foot proped up and reading that book." I then said, how can I do work when there are no pupils in the room to do work with. She then said in a loud and angry tone "You should have went to the attendance office and called the pupils parents." I had no idea where the attenda office was at, and let alone the pupils names. At this moment, I felt belittle

(Her tone was angry) & loud

(5)

and uninformed. The office clerks gave me
no further directions in what to do, when
I had no pupils in the class during a regular
class schedule. I then told her she
was making me feel like a lazy black
man. She then said, "I have a witnessed
(pointing to a woman across the hall about
11 yds away), that you are sitting here and
doing no work to earn your paycheck." I then
told her she could have sent me to
the attendance office to do some work.
I then told her I was going to have a
job by next week. And then she said "
where?" Her attitude was
mean when she asked me this. I then said,
Why do you want to know? She then
said (in a threatening way) "I can find
out," I then said you can't stop me
from getting the job (because she sounded
like she was going to try to black ball
me) and it's really none of your business.
She then said "I am the principal!" I
then said your not GOD, and I didn't
care who she was." [I also asked
her if she approached all of her substitutes
in the way she approached me; she

(6)

~~said yes I did not believe her, because remember the day to day sub assigned to their school was sitting down and drawing pictures of pupils and not working, before I took over Mr. Anderson classes. I~~

After telling her she was not GOD, and I didn't care who she was. Because she was not fulfilling the responsibilities of a principle as stated in the ~~Uniform Discipline code~~. Bullet one (pg11) states a principal should "use professional ethics in relationships with staff, students, parents and the community." And bullet seven (pg11) "Demonstrate by attitude and actions genuine concern and respect for all."

She then asked me to leave the building, and I asked her would I get paid for the whole day and she said "No!". So I then told her I would not leave if I did not get paid for the whole day, because I needed a whole day's pay.

She then said "I don't believe this, I'm going to call Nancy Slavin," I then told her, I would be writting a complaint about the way she approached me. Because

⑦

I do have the ~~right~~ to write-up a person who is demeaning and disrespectful towards me ~~(see pg. 4 of types of Disciplinary Action Group 2 acts of misconduct - pg. 9)~~.

So, Mrs. Bibbs comes back with this police officer and said "I just talk to GOD."(reffering to Nancy Slavin). I felt offended, because she just belittle my GOD to a woman. The cop said "Its best you just get your stuff and go." I then asked mrs. Bibbs was I going to get paid for the whole day. And I told her I would be contacting the union and I will be writing her up. She then said "I just talk to Nancy Slavin, and wrote you up."

So, I got my stuff together and proceeded to the office. When I got in the office, I asked for the position number, and no one said a word. So, the police officer asked "Can he get the position number." Then Mrs. Bibbs said "your not in a position to be asking for anything right now." She was talking down to me as though I had no rights and I didn't count. The police officer then said "You see they don't want to give



⑧

you the number so just leave." So I swiped out and left.

~~I felt humiliated, picked on, and disrespected by mrs. Bibbs~~. When I got out of the building. I call Angela Simpson I told her what happen, and she told me Nancy Slavin was her boss, I told her, I would be writing the principal up. she said go ahead, because she's going to write you up. After talking with her, I called the union and the clerk switch me over to a David Friedman. He said as long as I was going to get paid for the day, let it go. ~~[I also told Mrs. Simpson that I wanted Mrs. Bibbs to be held accountable, because I didn't want every principal thinking they could demean and insinuate things once and then throw us out of the building when I defended myself in the process]~~. (see Uniform Discipline code, pg 11)

On May 18, 2004, Angela Simpson put a hold on my work, Mrs. Slavin said there would be a hearing before I could work again. On May 20, 2004, I wrote a letter to Mrs Slavin, and Mrs. Simpson regarding back pay from being barred from work, and

(9)

from taking two physical education positions.
On May 24, 2004, Mrs. Simpson said "I
will get paid for all the days I did
not work." I asked for this in writing,
she said you don't get a letter for that.
She said she would give David Friedman
a letter in regards to my pay, so communicat
with him. On May 27, 2004, I present a letter,
hearing board to sign, in regards to me
getting my pay on June 4, 2004, like every b
else. (From 5/17/04 - 5/28/04)
From 5/31 - 6/11/04

Sincerely yours,

Best physical education teacher
in Chicago, Mr. Haderson

# EXHIBIT
# #

# 22

Exhibit #.

22



**CHICAGO PUBLIC SCHOOLS**

Arne Duncan, Chief Executive Officer

### Office of Labor and Employee Relations

Cheryl J. Colston
Director

Curtis L. Goodman
Assistant Director

Sharon Bailey
Thomas A. Krieger
Thomas M. Owens
Reshorna M. Wofford

October 19, 2004

Ms. Marilyn Stewart
President
Chicago Teachers Union
222 Merchandise Mart Plaza,Suite 400
Chicago, Illinois 60654-1005

Re: Michael Henderson
#04-09-261 (crd)

Dear Ms. Stewart:

This letter is in response to the grievance filed on behalf of the above-named former substitute teacher at Hale School.

Alleged Violation (s):
Articles 3 and 39-4.3. The grievant contends that he was terminated without the Department of Human Resources scheduling any conference with him to discuss the reasons for their dissatisfaction with his performance and to give him positive suggestions for improvement. Moreover, the grievant's personnel file indicates that he has never received an unsatisfactory rating from 1998 to the present. In order to resolve this matter, the grievant requests that his termination be rescinded and that he be allowed to continue as a substitute teacher with the Chicago Public Schools.



Response:
The decision to terminate the grievant's employment was based on facts presented to the grievant at a hearing on May 27, 2004, at which time the grievant was provided full due process. Further, in accordance with Article 39-4.4, dismissal for cause, which states in part that any decision to discipline is within the exclusive discretion of the principal and/or Board and is not subject to the grievance procedure.

Decision:
No contract violation occurred and this grievance is denied.

Sincerely,

Cheryl J. Colston

CJC:SB

cc:    Michael Henderson
       Colleen R. Dykas
       Sharon Tiller

125 South Clark Street, 13ᵗʰ Floor • Chicago, Illinois 60603
Telephone (773) 553-1200 • FAX (773) 553-1201

*Children First*

# EXHIBIT

#

23



**CHICAGO PUBLIC SCHOOLS**

**Arne Duncan**
Chief Executive Officer

November 29, 2004

Ms. Marilyn Stewart, President
Chicago Teachers Union
222 Merchandise Mart Plaza, Suite 400
Chicago, Illinois 60654-1005

Michael Henderson
#04-09-261 (crd)

Dear Ms. Stewart:

Pursuant to the provisions of Article 3-3 of the 2003-*2007 Agreement between the Board of Education of the City of Chicago and the Chicago Teachers Union*, a conference was held on November 4, 2004 concerning a grievance filed on behalf of Mr. Michael Henderson, a full-time basis substitute teacher formerly at Hale School. At the conference were Ms. Colleen Dykas, field representative, Chicago Teachers Union; Mr. Michael Henderson, grievant; and Ms. Reshorna M. Wofford, hearing officer, Department of Labor and Employee Relations.

Alleged violation(s):
Articles 3 and 39-4.3. The grievant contends that he was terminated without the Department of Human Resources scheduling any conference with him to discuss the reasons for their dissatisfaction with his performance and to give him positive suggestions for improvement. Moreover, the grievant's personnel file indicates that he has never received an unsatisfactory rating from 1998 to the present. In order to resolve this matter, the grievant requests that his termination be rescinded and that he be allowed to continue as a substitute teacher with the Chicago Public Schools.

Response:
The decision to terminate the grievant's employment was based on facts presented to the grievant at a hearing on May 27, 2004, at which time the grievant was provided full due process. During the May 27, 2004 due process hearing the hearing officer found that the grievant was derelict in his duties as a substitute teacher when he allowed students to leave his classroom and failed to report their absences while he sat in the classroom reading and listening to music with headphones. Further, in accordance with Article 39-4.4, dismissal for cause, which states in part that any decision to discipline is within the exclusive discretion of the principal and/or Board and is not subject to the grievance procedure.

Decision: There has been no contract violation. Grievance denied.

If you have questions regarding this matter, contact Reshorna M. Wofford at (773) 553-1200.

Sincerely,

Arne Duncan

AD:CJC:RMW

cc: Michael Henderson
Colleen R. Dykas
Sharon Tiller

OFFICE OF THE CHIEF EXECUTIVE OFFICER · 125 SOUTH CLARK STREET, 5TH FL. · CHICAGO, ILLINOIS 60603 · TELEPHONE 773/353-1550 · FAX: 773/553-1502

# EXHIBIT
# #
# 24

EXHIBITS # ᐱ

24 · 9/13/04

On September 13, 2004, I ~~Daniel Braids~~

received documentation and a tape from

Michael Henderson. This information is

evidence, in regards to his grievance.

Moreover, I am Mrs. Gayle's Koffman

CTU (chicago teacher's Union) assistant.

Michael D. Henderson

# EXHIBIT
# #
25

Exhibit # 25

From: Michael D. Henderson
To: Kristin Lions, CBE, Law Dept 17th Fl.
Regarding: Submitted ISLRB evidence

Without any elaboration, but pursuant to the rules the ISLRB. This tape is being submitted to you, because I will be using it as evidence. You can get the hearing tape from LBR.

Sincerely and Educationally yours,

Michael D. Henderson

Signature of Receipt _Veronica_
Written name _VERONICA HUIZAR_

# EXHIBIT
# #
# 26



*Exhibit #26*

## TEACHER RIGHTS

- Be present at any disciplinary conference concerning serious classroom disruption
- Be free from any physical or verbal threats while carrying out teaching and other duties
- Have guarantees as cited in the Agreement between the Board of Education of the City of Chicago and the Chicago Teachers Union

## LOCAL SCHOOL COUNCIL RESPONSIBILITIES

- Advise the principal concerning the attendance and disciplinary policies for the school
- Monitor and evaluate the implementation of those policies

## PRINCIPAL RESPONSIBILITIES

- Use professional ethics In relationships with staff, students, parents, and the community
- Provide orientation to new teachers and continuing assistance to all school personnel to resolve problems as they arise
- Review, monitor, and evaluate the program of instruction, and articulate the program to parents and the community at-large on an ongoing basis
- Involve the teachers and the auxiliary staff and, when appropriate, the staff of public and private agencies, with parents and students to identify problems and resolutions
- Establish a discipline committee and work with the staff to develop and enforce school regulations, relating them to systemwide policies
- Seek the assistance of appropriate staff, parents, and community agencies as needed to provide for the welfare of the students
- Demonstrate by attitude and actions genuine concern and respect for all
- Confer with school personnel, parents, students, and appropriate community agencies to formulate procedures and programs that will ensure socially acceptable student conduct
- Prepare and submit incident reports for Group 4, 5 and 6 violations and misconduct reports for all violations to the Bureau of Safety and Security and the Office of the Chief Education Officer or designee. Misconduct reports must be prepared, recorded, and a copy forwarded to the student's parent or legal guardian for every act of misconduct.
- Notify the Chicago Police Department as necessary
- Provide assistance to the Law Department in expulsion proceedings, including identification and production of witnesses and transmittal of documents to the Chief Education Officer or designee, and review all documentation forwarded to ensure that it is complete, accurate and properly written

## PRINCIPAL RIGHTS

- Cited in Section 34-8.1 of The School Code of Illinois, Board of Education Rule 6-12 and the Uniform Principal Performance Contract

## CHIEF EDUCATION OFFICER OR DESIGNEE DISCIPLINARY RESPONSIBILITIES

- Review school disciplinary actions and hear appeals regarding such actions
- Monitor the implementation of misconduct prevention and the safety/security program in each school
- Systematically monitor suspension, expulsion, and other disciplinary data by race, ethnicity, and sex of student, and prepare recommendations for improvement of school discipline
- Provide assistance to the Law Department in expulsion proceedings, including transmittal of documents and monitoring of school compliance

6

# EXHIBIT
# #

# 12/19

# TAPE

JS 44 (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as requir[ed] by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for t[he] use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**(a) PLAINTIFFS**

Henderson, Michael D.

FILED FOR DOCKETING
ED-7
05 JAN -5 PM 3: 40

GEO KLERK
DISTRICT COURT
JUDGE MAROVICH

**DEFENDANTS**

Chicago Board of Education

05 C 0069

**(b)** County of Residence of First Listed

(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed  Cook

(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED

MAGISTRATE JUDGE [...]

**(c)** Attorney's (Firm Name, Address, and Telephone Number) (773) 396-7955

Michael Henderson "Pro Se"
2728 W. Wilcox, Chicago. IL. 60612

Attorneys (If Known)  (773) 553-1700

Kristin Lions / Sharon Tiller
125 S. Clark, Suite 700, Chgo. IL. 6[...]

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

DOCKETED
JAN - 8 2005

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Pl[aintiff] and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | D |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal of Business In Another State | ☐ 5 | ☐ |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability / ☐ 365 Personal Injury — | of Property 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/e[tc] |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander / ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced a[nd] |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Injury Product | ☐ 650 Airline Regs. | | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability Liability | ☐ 660 Occupational | ☐ 820 Copyrights | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine **PERSONAL PROPERTY** | Safety/Health | ☐ 830 Patent | ☐ 850 Securities/Commoditi[es] |
| (Excl. Veterans) | ☐ 345 Marine Product / ☐ 370 Other Fraud | ☐ 690 Other | ☐ 840 Trademark | Exchange |
| ☐ 153 Recovery of Overpayment | Liability / ☐ 371 Truth in Lending | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☒ 190 Other Contract | Product Liability / ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Inj. Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | | Information [Act] |
| ☐ 220 Foreclosure | ☐ 442 Employment Sentence | | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Habeas Corpus: | ☐ 790 Other Labor Litigation | | Determination Under |
| ☐ 240 Torts to Land | Accommodations / ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff | Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare / ☐ 535 Death Penalty | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights / ☐ 540 Mandamus & Other | Security Act | ☐ 871 IRS—Third Party | State Statutes |
| | ☐ 550 Civil Rights | | 26 USC 7609 | ☐ 890 Other Statutory Action[s] |
| | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
(Cite the U.S. Civil Statute under which you are filing and write brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Breach of Contract

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ 28,000

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII.** This case ☒ is not a refiling of a previously dismissed action.

☐ is a refiling of case _____, previously dismissed by Judge _____

DATE  1/5/05

SIGNATURE OF ATTORNEY OF RECORD  Michael D. Henderson